[This opinion has been published in *Ohio Official Reports* at 85 Ohio St.3d 194.]

RITCHEY PRODUCE COMPANY, INC., APPELLEE, *v.* STATE OF OHIO,

DEPARTMENT OF ADMINISTRATIVE SERVICES, APPELLANT.

[Cite as *Ritchey Produce Co., Inc. v. Ohio Dept. of Adm. Serv.*,

1999-Ohio-262.]

*State government—Provisions of R.C. 125.081 requiring that approximately fifteen percent of state's purchasing contracts be set aside for competitive bidding by minority business enterprises only are constitutional—Provisions of R.C. 122.71(E) defining "minority business enterprise" with explicit reference to race are constitutional as applied to deny minority-business-enterprise status to business owned and controlled by person of Lebanese ancestry— Ohio's Minority Business Enterprise Program as it relates to purchasing contracts is constitutional.*

1.  The provisions of R.C. 125.081 requiring that approximately fifteen percent of the state's purchasing contracts be set aside for competitive bidding by minority business enterprises only and the provisions of R.C. 122.71(E) defining "minority business enterprise" with explicit reference to race are constitutional as applied to deny minority-business-enterprise status to a business owned and controlled by a person of Lebanese ancestry.

2.  Ohio's Minority Business Enterprise Program as it relates to the state's purchasing contracts is sufficiently narrowly tailored to pass constitutional muster.

(No. 97-2435—Submitted November 10, 1998—Decided April 7, 1999.)

APPEAL from the Court of Appeals for Franklin County, No. 97APE04-567.

————————————

{¶ 1} This appeal concerns an administrative order issued by the Ohio Department of Administrative Services ("ODAS"), appellant, denying

recertification of appellee, Ritchey Produce Company, Inc., as a minority business enterprise ("MBE") for purposes of Ohio's MBE set-aside program. See R.C. 122.71(E)(1), 123.151, and 125.081. The facts of this appeal are as follows.

{¶ 2} Ohio's MBE set-aside program mandates that certain percentages of the state's construction and procurement contracts are to be set aside for competitive bidding by MBEs only. The MBE program for state construction contracts operates in a straightforward manner.

{¶ 3} From all of the contracts to be awarded by ODAS under R.C. 123.15 and R.C. Chapter 153, the Director of Administrative Services must "select a number of contracts with an aggregate value of approximately five per cent of the total estimated value of contracts to be awarded in the current fiscal year." R.C. 123.151(C)(1). The director must then "set aside the contracts so selected for bidding by minority business enterprises only." *Id*. To the extent that any state agency other than ODAS is authorized to enter into construction contracts, those agencies are bound by a similar five-percent set-aside requirement. R.C. 123.151(D)(1). The bidding procedures for set-aside contracts are the same as for all other contracts awarded by ODAS under R.C. 123.15 and R.C. Chapter 153 (or by any other state agency), except that only MBEs certified and listed by the Equal Employment Opportunity Coordinator are qualified to bid. R.C. 123.151(C)(1) and 123.151(D)(1). Each contractor awarded a contract is required to "make every effort to ensure that certified minority business subcontractors and materialmen participate in the contract." R.C. 123.151(C)(2)(a). ODAS may not, however, enter into any contract authorized under R.C. 123.15 or R.C. Chapter 153, including any contract set aside under R.C. 123.151(C)(1), unless the contract contains a provision stipulating that the contractor, to the extent that it subcontracts work, "will award subcontracts totaling no less than five per cent of the total value of the contract to minority businesses certified under division (B) of this section and that the total value of both the materials purchased from minority businesses certified

2

under division (B) of this section and of the subcontracts awarded * * * to such minority businesses will equal at least seven per cent of the total value of the contract; except that in the case of contracts specified in division (A) of section 153.50 of the Revised Code * * * [a different stipulation is required]." R.C. 123.151(C)(2)(b).[1] The same requirements apply in the case of construction contracts that are set aside by state agencies other than ODAS. R.C. 123.151(D)(2).

{¶ 4} With respect to state procurement contracts for supplies and services, etc., the MBE set-aside program also operates in a straightforward manner. Specifically, from the purchases ODAS is required to make through competitive selection, the director must "select a number of such purchases, the aggregate value of which equals approximately fifteen per cent of the estimated total value of all such purchases to be made in the current fiscal year." R.C. 125.081(A). The director must then "set aside the purchases selected for competition only by minority business enterprises, as defined in division (E)(1) of section 122.71 of the Revised Code." Any agency of the state other than ODAS, the legislative and

---

1. R.C. 123.151(C)(3) sets forth a procedure by which the prime construction contractor can seek a waiver or modification of the minority-participation requirements of R.C. 123.151(C). Specifically, R.C. 123.151(C)(3) provides:

"Where a contractor is unable to agree to the provision required by division (C)(2) of this section because, having made a good faith effort, the contractor is unable to locate qualified minority businesses available to accept subcontracts or sell materials or services, the contractor may apply to the coordinator and the set aside review board created under division (C)(4) of this section for a waiver or modification of the provision. The coordinator shall review the application and shall make a recommendation to the board to allow or disallow the request. After receipt of the coordinator's recommendation, the board shall review the request. If the board finds that the contractor has made a good faith effort to locate and reach agreement with minority business subcontractors and materialmen or service providers but has been unable to do so due to circumstances beyond the reasonable control of the contractor, it may authorize the contract to include, in lieu of the provision required by division (C)(2) of this section, a provision stipulating a lesser percentage of the total value of the contract to be designated for minority business subcontractors and materialmen or it may waive such provision entirely, or stipulate a higher percentage of services permissible in contracts specified in division (A) of section 153.50 of the Revised Code. If the board does not grant the contractor's application for waiver or modification, and if the contractor is unable to agree with the provision required by division (C)(2) of this section, the contractor's bid shall be deemed nonresponsive to the specifications for which the bid was submitted."

judicial branches, boards of elections, and the adjunct general that is authorized to make purchases is likewise bound by a fifteen-percent set-aside requirement. R.C. 125.081(B). The competitive selection procedures for purchases set aside under R.C. 125.081(A) and (B) are the same as for any other purchases made by ODAS, or by a state agency other than ODAS, except that only MBEs certified and listed by the Equal Employment Opportunity Coordinator are qualified to compete. R.C. 125.081(A) and (B).

{¶ 5} R.C. 123.151(B)(1) provides that "[t]he director of administrative services shall make rules in accordance with Chapter 119. of the Revised Code establishing procedures by which minority businesses may apply to the equal employment opportunity coordinator for certification as minority business enterprises." R.C. 123.151(B)(2) provides that the coordinator "shall approve the application of any minority business enterprise that complies with the rules adopted under this division." Additionally, the statute provides that any person adversely affected by an order of the coordinator denying certification may appeal from the order as provided in R.C. Chapter 119. The statute also requires the coordinator to prepare and maintain a list of certified MBEs.

{¶ 6} R.C. 122.71(E)(1) defines "[m]inority business enterprise" for purposes of the MBE program. R.C. 122.71 provides:

"As used in sections 122.71 to 122.83 of the Revised Code:

"* * *

"(E)(1) 'Minority business enterprise' means an individual, partnership, corporation, or joint venture of any kind that is owned and controlled by United States citizens, residents of Ohio, who are members of one of the following economically disadvantaged groups: Blacks, American Indians, Hispanics, and Orientals.

"(2) 'Owned and controlled' means that at least fifty-one per cent of the business, including corporate stock if a corporation, is owned by persons who

4

belong to one or more of the groups set forth in division (E)(1) of this section, and that such owners have control over the management and day-to-day operations of the business and an interest in the capital, assets, and profits and losses of the business proportionate to their percentage of ownership. In order to qualify as a minority business enterprise, a business shall have been owned and controlled by such persons at least one year prior to being awarded a contract pursuant to this section."

{¶ 7} Supplementing the statute, a rule promulgated by the Director of Administrative Services further defines these terms and, among other things, establishes the application and certification requirements for Ohio MBEs. See Ohio Adm.Code 123:2-15-01. The rule requires that "[a]ny minority business enterprise that desires to bid on a contract under division (C)(1) or (D)(1) of section 123.151 of the Revised Code or under division (A) or (B) of section 125.081 of the Revised Code or to be a minority business subcontractor or materialman under division (C)(2) or (D)(2) of section 123.151 of the Revised Code shall first apply with the equal employment opportunity coordinator of the department of administrative services for certification as a minority business enterprise." Ohio Adm.Code 123:2-15-01(B). Certification may be granted for a period not exceeding one year and, thus, successful applicants must reapply annually for MBE recertification. Ohio Adm.Code 123:2-15-01(C). The rule defines "minority business enterprise" as "an individual, partnership, corporation, or joint venture of any kind that is owned and controlled by United States citizens, residents of Ohio, who are and have held themselves out as members of the following economically disadvantaged groups: Blacks, American Indians, Hispanics, and Orientals." Ohio Adm.Code 123:2-15-01(A).[2] For purposes of the rule, " 'Orientals' means all persons having origins in

---

2. Ohio Adm.Code 123:2-15-01(A)(6) through (8) define "Blacks," "American Indians," and "Hispanics" as follows:

"(6) 'Blacks' means all persons having origins in any of the black racial groups of Africa.

any of the original people of the Far East, including China, Japan and Southeast Asia." Ohio Adm.Code 123:2-15-01(A)(9).

{¶ 8} Nadim F. Ritchey ("Ritchey") is the sole shareholder of Ritchey Produce Company, Inc. ("Ritchey Produce"), appellee. Ritchey Produce is a wholesale supplier of fruits and vegetables. Ritchey, who was born in Lebanon, is a naturalized citizen of the United States and is a resident of Ohio. In 1990, Ritchey filed an application seeking MBE certification for Ritchey Produce. On the front page of the application, Ritchey indicated that he is a member of a racial or ethnic group identified as "Oriental." However, on the second page of the application form, Ritchey stated that his national origin is the country of Lebanon and that he is Lebanese. In August 1991, Ritchey Produce received MBE certification for the twelve-month period beginning August 31, 1991, and was granted recertification as an MBE in each of the three succeeding years. During the period of certification, appellee was awarded an R.C. 125.081(A) set-aside contract by ODAS covering the state's requirements for fresh fruits and vegetables from July 1995 through September 1997.

{¶ 9} In 1995, Ritchey filed an application for recertification of Ritchey Produce as an MBE. The company's then-current MBE certification was set to expire October 31, 1995. However, during the recertification process, the State Purchasing Office advised the ODAS Equal Opportunity Center that Ritchey is Lebanese and that therefore Ritchey Produce might not have been properly certified as an MBE. Apparently, that information had come to light as a result of concerns

"(7) 'American Indians' means all persons having origins in any of the original peoples of North America, and who maintain cultural identification through tribal affiliation or community recognition.
"(8) 'Hispanics' means all persons of Spanish or Portuguese culture with origins in Mexico, South or Central America or the Caribbean Islands, regardless of race."
In 1995, the Franklin County Court of Appeals determined that the term "Orientals" in R.C. 122.71(E)(1) includes businesses owned and controlled by persons with origins in the country of India or, geographically, the Indian subcontinent. *DLZ Corp. v. Ohio Dept. of Adm. Serv.* (1995), 102 Ohio App.3d 777, 780-781, 658 N.E.2d 28, 30-31.

raised by an unsuccessful bidder on the contract that had previously been awarded to Ritchey Produce. An investigation of the matter, which apparently included a review of the company's original application for MBE certification, revealed that Ritchey, the sole owner of Ritchey Produce, is of Lebanese descent. Accordingly, by letter dated October 31, 1995, ODAS notified Ritchey of the Equal Employment Opportunity Coordinator's intent to deny the application. The asserted basis for denial was that Ritchey Produce was not owned by an Oriental person or by a member of any other racial/ethnic group listed in Ohio Adm.Code 123:2-15-01(A). Thereafter, Ritchey requested a hearing on the matter before the Director of ODAS, and the matter was submitted to an ODAS hearing examiner for consideration of the parties' written position statements and proffered exhibits.

{¶ 10} In a report and recommendation, the ODAS hearing examiner found that Ritchey, the sole owner of Ritchey Produce, was not "Oriental" within the meaning of R.C. 122.71(E)(1). Therefore, the hearing examiner concluded that because Ritchey was not a member of a specific minority group listed in R.C. 122.71(E)(1), appellee Ritchey Produce did not meet the requirements for MBE certification. In April 1996, the Director of Administrative Services adopted the report and recommendation of the hearing examiner and denied the application for recertification of Ritchey Produce as a qualified MBE. Apparently, this action did not affect the contract that Ritchey Produce had previously been awarded by ODAS.

{¶ 11} Subsequently, appellee filed in the Court of Common Pleas of Franklin County an R.C. 119.12 appeal from the agency's final adjudication order. The matter was referred to a magistrate of the court. See Civ.R. 53. On October 21, 1996, the magistrate issued her decision, finding that ODAS's final adjudication order denying Ritchey Produce's request for recertification violated the equal protection guarantees of the Fifth and Fourteenth Amendments to the United States Constitution. Specifically, the magistrate considered the provisions of R.C.

125.081(A) (pertaining to purchasing contracts that must be set aside for bidding by MBEs) and the provisions of R.C. 122.71(E)(1) (defining "[m]inority business enterprise") and stated:

"[ODAS's] Order was based solely on the interpretation of the statute [R.C. 122.71(E)(1)] that only those four specifically named groups can be minorities for purposes of the MBE set aside statute [R.C. 125.081]. However, by case law, the statute has been enlarged to include Asian Indians as Orientals. See [*DLZ Corp. v. Ohio Dept. of Adm. Serv*. (1995), 102 Ohio App.3d 777, 658 N.E.2d 28].

"[Ritchey] concedes that he is not Oriental and argues that, instead of focusing on the racial classifications contained within the statutes themselves, that the focus must be on the words 'economically disadvantaged.' Ritchey further argues that there should be a rebuttable presumption that the businesses within the named races are economically disadvantaged. * * *

"The United States Supreme Court has recently held that the application of a statute which is race based must be reviewed with strict scrutiny and must be narrowly tailored to further a compelling governmental interest. *Adarand Constructors, Inc. v. Pena* (1995) [515 U.S. 200], 115 S.Ct. 2097, 132 L.Ed.2d 158. The Court recognized that not all minority contractors are economically or socially disadvantaged and that there might not be actual discrimination occurring. To award the contract based on race and without regard to any other factors does not meet the requirement of strict scrutiny nor is it narrowly tailored to further a compelling governmental interest. The government clearly has a compelling interest in avoiding racial discrimination. But this statute, as applied herein, potentially discriminates against other socially or economically disadvantaged groups by narrowing its protected races to Blacks, Hispanics, American Indians and Orientals. Rather, the focus, herein, as proposed by [Ritchey Produce], must be on whether or not there is actual disadvantage. A group which can show disadvantage must be permitted to participate. *Adarand*, *supra*. DAS failed to address that issue,

sidestepping it, by noting that Lebanese people are not Orientals. In doing so, they violated [Ritchey Produce's] Fifth and Fourteenth Amendment right to equal protection.

"While it is the opinion of this Magistrate that the law needs to be rewritten to avoid cases such as this one * * *, it can be saved by requiring the EEOC, in the future, to look at economic disadvantage rather than race as the determining factor. Those named races, as suggested in *Adarand*, *supra*, could be rebuttably presumed to be disadvantaged."

**{¶ 12}** Accordingly, the magistrate concluded that "the MBE statute as it is being applied is unconstitutional," and that the matter should therefore be remanded to ODAS for a determination whether Ritchey Produce is an economically disadvantaged enterprise that "should be recertified under this new strict scrutiny review."

**{¶ 13}** ODAS filed written objections to the decision of the magistrate. However, despite ODAS's protests, Judge Daniel T. Hogan of the common pleas court adopted the magistrate's decision, stating:

"[ODAS] argues that [Ritchey Produce] is not eligible to participate in [an] MBE program because its owner [is] of Lebanese descent. The program is set up to remedy past discrimination by requiring the set aside of public contracts for certain economically disadvantaged groups: namely Blacks, American Indians, Hispanics and Orientals.

"The ODAS argues, at great length, that Mr. Ritchey being Lebanese is not Oriental, and therefore may not participate in the program regardless of 'economic disadvantage.'

"[Ritchey Produce], on the other hand, argues that the Equal Protection guarantees of the Fifth and Fourteenth Amendments to the United States Constitution prohibit exemptions based on race per se. Instead, for Ohio's MBE Program to be constitutional, the use of the racial categories must merely represent

that these ethnic groups are granted a rebuttable presumption that they are 'disadvantaged.' Moreover, ODAS must make individualized case-by-case determinations with respect to whether businesses owned by other racial groups qualify as 'disadvantaged business enterprises.' This case-by-case determination without regard to race per se was the administrative procedure in place when [Ritchey Produce] was originally certified as a Minority Business Enterprise in 1990. * * * [Citing a 1992 deposition of former Equal Employment Opportunity Coordinator Booker T. Tall.]

"[*DLZ Corp.*, 102 Ohio App.3d 777, 658 N.E.2d 28] was decided upon issues of statutory construction rather than the constitutionality of the MBE program. In that case, the Tenth District Court of Appeals determined that 'Oriental' as used in the statute defining eligibility for participation in the MBE set aside program includes people with origins in India.

"Working our way north and west from India we first come to Pakistan, then Iran, then Iraq, then Syria, and finally Lebanon. If Asian Indians are 'Oriental,' shall we exclude Pakistanis separated from India only by the Great Indian Desert? And if Pakistanis are 'Oriental,' shall we exclude Iranians who share a common border with Pakistan? And if Iran is 'Oriental,' shall we exclude Iraq separated from Iran only by the Zagros Mountains? And if Iraq is 'Oriental,' shall we exclude Syria, for the Euphrates River flows through both countries? And finally if Syria is 'Oriental,' how can its contiguous neighbor Lebanon be anything but 'Oriental'?

"This Court can think of few things more repugnant to our constitutional system of government than the construction of a statute that would exclude a group of United States citizens and residents of Ohio from a State program, the sole criteri[on] for exclusion being the side of a river, a mountain range, or a desert their ancestor decided to settle.

10

"For these reasons, as well as the reasons stated in the Magistrate's opinion, the Court finds that the MBE statute as it is being applied is unconstitutional. This case is REVERSED and it is REMANDED for a determination of whether or not [Ritchey Produce] remains an economically disadvantaged enterprise which should be recertified under new strict scrutiny review."

{¶ 14} On appeal, the court of appeals majority found that the racial classification in R.C. 122.71(E)(1) "appears to be based on the presumption that caucasians and other minority groups are not disadvantaged, socially or economically, but that all members of the listed minority groups are socially and economically disadvantaged." In this regard, the court of appeals found that the classification was both underinclusive and overinclusive, since "[t]here may be socially and economically disadvantaged business owners who are excluded from the program simply because of their race" and "there may be business owners who are not socially and economically disadvantaged yet eligible to participate in the program simply because they are among the four enumerated minority groups." Therefore, the court of appeals determined that the MBE program was not "narrowly tailored" to further a compelling governmental interest, and stated that "[w]hile remedying past discrimination may be a compelling interest, we find it hard to envision a situation in which a race-based classification is narrowly tailored."

{¶ 15} Additionally, the court of appeals, relying on *Adarand*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158, stated, "This court construes *Adarand* to mean that race may, in some circumstances, create a presumption of disadvantage, but that other races cannot be excluded based solely on statutory presumptions such as the one in R.C. 122.71(E)(1)." The court of appeals concluded that the goal of the MBE Program "ideally" should be to maximize the opportunity for all economically or socially disadvantaged Ohioans. The court also concluded that the state's present policy reflects that goal as indicated by Executive Order 96-53V,

entitled "Socially and Economically Disadvantaged Business Policy." Moreover, the court of appeals, relying on a 1992 deposition of former Equal Employment Opportunity Coordinator Booker T. Tall, stated, "[ODAS] had, at one point, shared the belief that the MBE racial distinctions exist because of a mere presumption that those racial groups are disadvantaged. [Tall] testified that, prior to 1995, MBE certification was based not on whether the applicant fit neatly into one of the enumerated racial categories, but whether the applicant qualified as a disadvantaged business enterprise. The certification determinations were made on a case-by-case basis. Apparently, [Ritchey Produce's] prior MBE certificates were granted under that prior practice."

{¶ 16} The court of appeals did not decide the question whether Ritchey Produce qualified as an Oriental company, finding that because "the enumerated racial classifications could not constitutionally exclude [Ritchey], it makes no difference whether a Lebanese, such as [Ritchey], would qualify as an oriental." Accordingly, the court of appeals affirmed the judgment of the trial court, holding that "the state's MBE program is a race *per se* classification" and "was unconstitutionally applied to deny [Ritchey] MBE certification." The court of appeals remanded the cause to ODAS "for further review of [Ritchey's] application irrespective of race."

{¶ 17} Presiding Judge G. Gary Tyack, in a concurring opinion, stated that he agreed with the decision affirming the judgment of the trial court, but not for the reasons stated by the court of appeals majority. Specifically, Judge Tyack stated that he would have decided the controversy on the sole basis that Ritchey's Lebanese ancestry qualified him as Oriental and qualified Ritchey Produce for MBE certification. Accordingly, Judge Tyack concluded that there was no need to address the arguments concerning the constitutionality of Ohio's MBE program.

{¶ 18} The cause is now before this court pursuant to the allowance of a discretionary appeal.

_____

*Bricker & Eckler L.L.P.*, *Luther L. Liggett, Jr.*, and *Kimberly J. Brown*; and *William D. Joseph*, for appellee.

*Betty D. Montgomery*, Attorney General, *Judith L. French* and *Darius N. Kandawalla*, Assistant Attorneys General, for appellant.

*Squire, Sanders & Dempsey L.L.P.*, *Frederick R. Nance* and *Michael W. Kelly*, urging affirmance on other grounds for *amici curiae*, the Ohio Black Legislative Caucus, Senator Jeffrey Johnson and Representatives Otto Beatty, Samuel Britton, Troy Lee James, Peter Lawson Jones, Mark Mallory, Sylvester Patton, C.J. Prentiss, Tom Roberts, Vernon Sykes, Charleta Tavares, and Vermel Whalen.

_____

**DOUGLAS, J**.

{¶ 19} As a preliminary matter, we note that appellee and *amici* raise a number of arguments that tend to confuse rather than to clarify the issues presented by this appeal. Therefore, it is necessary to dispel some of this confusion before proceeding to the primary issue raised in this appeal, to wit, whether Ohio's MBE Program, as administratively applied and as written, violates the equal protection guarantees of the Fourteenth Amendment to the United States Constitution.[3]

I

{¶ 20} In its brief, ODAS correctly notes that racial classifications of the type set forth in R.C. 122.71(E)(1) must be analyzed under strict scrutiny. The

---

3. Appellee also argues that Ohio's MBE Program, as administratively applied, violates the equal protection component of the *Fifth* Amendment to the United States Constitution. The equal protection guarantee of the Fifth Amendment is coextensive with that of the Fourteenth. See, generally, *Adarand Constructors, Inc. v. Pena* (1995), 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158. However, a Fifth Amendment equal protection analysis is appropriate where the equal protection challenge is based on the actions of the *federal* government. *Id*. Therefore, our analysis in this case focuses on the Equal Protection Clause of the Fourteenth Amendment, since that amendment explicitly governs the actions of the *states* on the subject of equal protection.

reason, of course, is that "government may treat people differently because of their race only for the most compelling reasons." *Adarand Constructors, Inc. v. Pena* (1995), 515 U.S. 200, 227, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158, 182. Under strict scrutiny, governmental classifications based on race, even purportedly "benign" or "remedial" racial classifications of the type at issue here, are constitutional only if they are "narrowly tailored measures that further compelling governmental interests." *Id*. Accordingly, in its first proposition of law, ODAS argues that Ohio's MBE set-aside program satisfies both prongs of strict scrutiny, to wit, there was a compelling governmental interest for the adoption of the MBE program, and the program is narrowly tailored to meet that interest. As a necessary part of this argument, ODAS has explored, at some length, the facts and history that gave rise to the enactment of Ohio's MBE program. In its second proposition of law, ODAS argues that the administrative determination denying appellee's application for MBE recertification was correct, since the owner of the business, Ritchey, is clearly not "Oriental" within the meaning of R.C. 122.71(E)(1). On the basis of these two propositions, ODAS seeks reversal of the judgment of the court of appeals and reinstatement of the administrative adjudication order denying the request for MBE recertification of Ritchey Produce.

{¶ 21} In response to ODAS's first proposition of law, appellee argues that ODAS's entire analysis concerning the constitutionality of Ohio's MBE program raises issues that were neither argued nor decided in the courts below. Specifically, in its merit brief, appellee contends: "The State argues in its first proposition of law the facial validity of its MBE program and the underlying State interests. Accordingly, the State spends an inordinate amount of time arguing its compelling interest for legislating such a program. However, Ritchey Produce never challenged the facial validity of the State's MBE program and concedes the State's compelling interest in creating a 'disadvantaged business enterprise' program." In addition, appellee argues that it never challenged the validity of Ohio's MBE

14

program but "instead challenged how ODAS reversed its policy and decertified Ritchey Produce on race *per se*." Appellee concludes, therefore, that "[a]s the lower courts never considered either a record or arguments on the validity of the State's underlying interest in creating its MBE program, the State improperly raises these issues before this Court," and ODAS's first proposition of law should be stricken.

{¶ 22} We disagree with Ritchey Produce's claim that ODAS's first proposition of law should be stricken. Rather, we find that strict scrutiny requires consideration of the type of issues that have been briefed and argued by ODAS in its first proposition of law. That is, the question whether the MBE program is narrowly tailored to further a compelling governmental interest necessarily requires consideration of the compelling interest that gave rise to the program's creation, *i.e.*, the requirements of a compelling interest and narrowly tailored means go hand in hand. Further, appellee's concession that the state had a compelling interest to enact a disadvantaged business enterprise program underscores the fact that appellee does not fully comprehend the nature and character of Ohio's MBE program. This fact becomes all the more apparent when appellee's arguments are considered in detail.

{¶ 23} Appellee claims that the MBE program, specifically, R.C. 122.71, "expressly creates a 'disadvantaged business enterprise' program." In connection with this argument, appellee has gone to great lengths in an attempt to convince us that ODAS changed its policy on MBE certifications between the time appellee was originally granted certification in 1991 and the time appellee's request for recertification was denied in April 1996. According to appellee, "in April 1996, ODAS reversed its course with no change in fact or law, and decertified Ritchey Produce based on the sole criteri[on] that Ritchey Produce racially does not meet the State's latest definition of 'Oriental.' " Appellee suggests that "[w]hile prior to this time ODAS based MBE determinations upon whether the applicant qualified

as 'socially or economically disadvantaged' *as described in the statute*, ODAS unconstitutionally altered its administration of its MBE program to focus on race *per se*." (Emphasis added.)

{¶ 24} We find that appellee's arguments misconstrue the language, nature, and character of Ohio's MBE program. R.C. 122.71(E)(1) defines "minority business enterprise" as a business that is owned and controlled by persons "of the following *economically disadvantaged* groups: Blacks, American Indians, Hispanics, and Orientals." (Emphasis added.) Apparently, appellee believes that a plain reading of the statute requires ODAS to consider whether an applicant for MBE certification is socially or economically disadvantaged and to certify businesses that demonstrate disadvantage *regardless of the business owner's race*. That is, appellee reads R.C. 122.71(E)(1) as including in the definition of "minority business enterprise" businesses that are owned and controlled by members of the four groups specifically listed in the statute *and any other businesses* that can demonstrate economic disadvantage. However, R.C. 122.71(E)(1) clearly does not say that. Rather, under the plain terms of the statute, the four groups listed in R.C. 122.71(E)(1) are considered to be "economically disadvantaged groups," and only businesses owned and controlled by members of the specified groups are capable of satisfying the statutory definition of "minority business enterprise."

{¶ 25} Moreover, appellee's position that R.C. 122.71(E)(1) plainly creates a disadvantaged-business-enterprise program—*i.e.*, one which benefits, *inter alia*, groups or individuals that fall outside the racial classification and that demonstrate economic disadvantage—is completely untenable in light of the legislative history of R.C. 122.71(E)(1). Specifically, that statute was originally enacted in 1980 as part of Am.Sub.H.B. No. 584, 138 Ohio Laws, Part II, 3062, 3065. As originally enacted, former R.C. 122.71(E)(1) provided: " 'Minority business enterprise' means an individual, partnership, corporation, or joint venture of any kind that is owned and controlled by United States citizens, residents of Ohio, who are

members of *an economically disadvantaged group including, but not limited to, the following groups:  Blacks, American Indians, Hispanics, and Orientals*." (Emphasis added.)  *Id*.  In 1981, the above-emphasized portion of the statute was altered by amendment, and the following language was inserted in its place:  "one of the following economically disadvantaged groups:  Blacks, American Indians, Hispanics, and Orientals."  139 Ohio Laws, Part II, 3166 and 3506.  Obviously, the 1981 amendment to R.C. 122.71(E)(1) evinces a clear legislative intention not to include in the definition of "minority business enterprise" any businesses owned and controlled by members of any group other than the four specific groups listed in the statute.

**{¶ 26}** Further, to accept appellee's interpretation of the statute would essentially require us to rewrite it and to enact a new MBE program that benefits all disadvantaged businesses, thereby changing the MBE program into a disadvantaged-business-enterprise program.  However, Ohio's MBE program was clearly designed to serve a far different purpose from the one appellee suggests it should now serve.  Given the plain language of R.C. 122.71(E)(1) and its history, we are in no position to modify the clear and unambiguous terms of the statute by rewriting it, under the guise of judicial interpretation, to make it say something far different from what the statute actually says and means.  This court is not now, nor has it ever been, a judicial legislature.  When a statute is assailed as unconstitutional, it is our duty to liberally construe it to save the statute from constitutional infirmities.  See, *e.g*., *Wilson v. Kennedy* (1949), 151 Ohio St. 485, 492, 39 O.O. 301, 304, 86 N.E.2d 722, 725.  However, that duty does not entail our having to rewrite a statute so as to give it an entirely new meaning, particularly where the new meaning would utterly oppose the purposes for which the statute was enacted.

**{¶ 27}** Appellee also claims, and the court of appeals apparently agreed, that former Equal Employment Opportunity Coordinator Booker T. Tall had granted

MBE certification to appellee in 1991 based solely on a determination that appellee was a "disadvantaged business" enterprise. To support this argument, appellee relies on Tall's 1992 deposition in an unrelated case. Armed with this deposition, appellee argues that "[w]hen Ritchey Produce first applied [for MBE certification], ODAS correctly certified any business demonstrating actual 'social or economic disadvantage,' thus certifying MBE's on a case-by-case basis. According to the sworn deposition testimony of State EEOC Coordinator Booker T. Tall (the *same* coordinator who first certified Ritchey Produce as an MBE), determinations of whether a business qualified for MBE status rested upon whether the business qualified as a 'disadvantaged business enterprise,' not whether the business fit neatly into the listed racial categories of Black, Hispanic, American Indian or Oriental." (Emphasis *sic*.)

{¶ 28} We have reviewed Tall's deposition testimony in its entirety, and we find that it does not fully support appellee's contentions. Nor does the deposition fully support the conclusions of the court of appeals on this issue. The testimony indicates that, during Tall's tenure as Equal Employment Opportunity Coordinator, applications for MBE certification were reviewed to determine whether each applicant was an "economically disadvantaged" enterprise. The testimony also indicates, however, that MBE certifications were issued by Tall only upon a determination that directly linked the ownership and control of the business to members of one of the four specific racial or ethnic groups listed in R.C. 122.71(E)(1). Thus, it appears, when Tall originally granted MBE certification to appellee, the certification was premised upon a determination that Ritchey, the owner of the company, was Oriental. Precisely how Tall could have reached that conclusion remains a mystery. Perhaps he construed the term "Oriental" to include a person of Lebanese descent, or perhaps he never thoroughly reviewed appellee's original application for MBE certification, wherein Ritchey indicated, among other things, that he was Lebanese. In any event, as the magistrate noted at the trial court

level, "under [*DLZ Corp. v. Ohio Dept. of Adm. Serv.* (1995), 102 Ohio App.3d 777, 658 N.E.2d 28] *and the law as technically written*, *and previously applied*, Ritchey Produce was mistakenly certified as an MBE from the beginning." (Emphasis added.)  Moreover, even if Tall did purposely certify MBEs regardless of race, that practice clearly does not comport with the language and purposes of R.C. 122.71(E)(1).

{¶ 29} There is also some evidence in the record (namely, Ritchey's affidavit) that when Ritchey first applied for MBE certification, an employee of the state's Equal Employment Opportunity Coordinator's Office had interviewed Ritchey and had instructed him to fill out the application form by "check[ing] the box under 'racial/ethnic group' that most closely related to [Ritchey's] nation of origin."  Since there were only four racial groups from which Ritchey could chose, *i.e*., Black, Hispanic, American Indian, and Oriental, Ritchey chose "Oriental" and marked the application accordingly.  Appellee claims to have made that choice because the term "Oriental" was consistent with his "traditional understanding" that the term included people of Lebanese descent.  Ritchey also asserts that he did not arrive at that decision himself and implies that the interviewer, by directing him to choose one of the four possible options on the application form, had participated in that decision.  However, to the extent that the interviewer did participate in the conclusion that Ritchey was Oriental (and, incidentally, there is no proof that the interviewer did so), that conclusion was clearly incorrect.  See our discussion in Part VII, below.  Moreover, there is simply no proof that the actions of the employee or employees who interviewed Ritchey represent a department-wide policy of certifying MBEs regardless of the business owner's race.  The decision to approve the original application for MBE certification was Tall's decision to make, and we have already stated our views concerning his deposition testimony.  Although Ritchey apparently never intended to deceive anyone with respect to his race or

ethnicity, the fact that Ritchey Produce was certified as an Oriental-owned MBE appears to have resulted from a series of errors.

{¶ 30} Appellee also relies heavily on *Adarand*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158, for the proposition that racial classifications of the type in R.C. 122.71(E)(1) can never be applied to deny MBE certification on the basis of race *per se*. Appellee contends that "according to *Adarand* and as found by the court of appeals, while race may be used as a rebuttable presumption of economic disadvantage, nothing justifies the State to exclude *per se* other races, when they can demonstrate actual disadvantage." Similarly, appellee suggests that "*Adarand* requires that to constitutionally enforce the MBE program the State must base its eligibility determinations on actual and social economic disadvantage," so that appellee must be admitted to the program upon proof of disadvantage.

{¶ 31} However, neither *Adarand* nor any other decision of the United States Supreme Court specifically indicates that such a blanket constitutional principle exists with respect to remedial race-based state action that is necessary to serve compelling governmental interests, and that is narrowly tailored to the achievement of that objective. What *Adarand* does hold is that all governmental classifications based on race must satisfy the strict scrutiny standard of review, so that racial classifications will be deemed constitutional only if they are narrowly tailored measures that further compelling governmental interests. *Id*. at 227, 115 S.Ct. at 2113, 132 L.Ed.2d at 182; see, also, our discussion in Part II, below. The entire point of *Adarand* was to make explicit that federal racial classifications, like those of a state, are subject to the strict scrutiny standard of review. *Id*. at 235, 115 S.Ct. at 2117, 132 L.Ed.2d at 187; see, also, our discussion in Part II, below. Moreover, the court in *Adarand* remanded the matter at issue there to the lower federal courts for analysis under strict scrutiny. *Id*. at 237-239, 115 S.Ct. at 2118, 132 L.Ed.2d at 188-189; see, also, our discussion in Part II, below. Thus, in *Adarand*, the United States Supreme Court did not conduct strict scrutiny itself and

did not determine whether strict scrutiny was satisfied on the facts of that particular case.

{¶ 32} Appellee also cites certain executive orders that were issued by Governor George V. Voinovich in 1996 and 1997, specifically, Executive Order 96-53V (entitled "Socially and Economically Disadvantaged Business Policy"), and Executive Order 97-14V (entitled "Historically Underutilized Business Policy").[4] These executive orders indicate a policy of the state with respect to the

---

4. In March 1996, Governor George V. Voinovich issued Executive Order 96-53V, entitled "Socially and Economically Disadvantaged Business Policy." The order directed ODAS's Equal Opportunity Center to begin cross-certifying MBEs that had federal disadvantaged-business-enterprise ("DBE") status as both MBEs and Ohio DBEs. The order also directed ODAS to begin establishing a system of certifying Ohio DBEs on the basis of economic and social disadvantage. The Governor's order directed all cabinet-level state agencies, beginning in 1997, to establish a goal that five percent of their available contracting dollars in the area of construction, goods, and services be awarded through open and competitive bidding to Ohio DBEs. In June 1997, Governor Voinovich issued Executive Order 97-14V. The 1997 order changed the name of the "Socially and Economically Disadvantaged Business Policy" to the "Historically Underutilized Business Policy," and required cross-certification of MBEs with federal DBE status as historically underutilized businesses, or "HUBs." The 1997 order, which is substantially similar to the 1996 order, is set out below:

"WHEREAS, the Voinovich/Hollister Administration is committed to making all state services, benefits and opportunities available without discriminating on the basis of race, color, religion, sex, national origin, disability, age or ancestry; and

"WHEREAS, the State of Ohio recognizes that a significant number of struggling businesses are owned by Ohio citizens who are competitively underutilized because of their social and economic status; and

"WHEREAS, the State of Ohio has a duty to secure the best available product at the lowest possible price and can best [do] so by assuring that as many qualified businesses as possible compete for every available contract; and

"WHEREAS, the State of Ohio recognizes the need to encourage, nurture and support the growth of economically and socially underutilized businesses to foster their development and increase the number of qualified competitors in the marketplace;

"NOW THEREFORE, I, George V. Voinovich, Governor of the State of Ohio, by virtue of the power and authority vested in me by the constitution and the statutes of the State of Ohio, do hereby order the following:

"1. the Director of Minority Affairs for the Office of the Governor shall provide oversight and policy guidance to all state agencies in the implementation of this Executive Order.

"2. The Department of Administrative Services' State Equal Opportunity Division shall immediately:

"a. begin cross-certifying and recognizing those minority business enterprises (MBEs) which also have federal disadvantaged business enterprise 8(a) status (DBEs) as historically underutilized businesses (HUBs);

"b. begin designating and maintaining a list of all federally registered DBEs which are not certified MBEs but which are interested in doing business with the State of Ohio as HUBs;

"c. begin establishing a system of certifying Ohio HUBs which is based on a requirement that the business owner show both social and economic underutilization in order to become certified. The Department of Administrative Services' Equal Opportunity Division shall establish Ohio guidelines which mirror the federal law, where appropriate, for determining:

"1. economic disadvantage based on the relative wealth of the company seeking certification as well as the personal wealth of the owner(s) of the company;

"2. social disadvantage based on one of two ways: (1) a rebuttable presumption when the business owner shows membership in a traditionally recognized racial minority group; or (2) by showing personal disadvantage due to color, ethnic origin, gender, physical disability, long-term residence in an environment isolated from the mainstream of American society, location in an area of high unemployment, or other similar cause not common to most small business persons;

"d. establish standards to determine when a business should be graduated as a result of achieving success to such a degree that the benefits of a state sponsored program are no longer necessary and the business can no longer be fairly considered to be disadvantaged. Businesses should also be removed after a period of time whether or not they have graduated from the program subject to the following:

"1. those standards which determine success on an economic basis shall be adjusted to reflect inflation and market fluctuation;

"2. graduation or removal in cases of family owned businesses should be judged on their individual merits and not be based on a previous owner/family member's business success;

"3. a program extension of two years shall be provided even though the business has graduated provided the owner participates in mentoring, partnering or joint venturing with a new HUB;

"4. a business removed for non disciplinary reasons or graduated from the program may re-enter the program after one year provided that it meets all eligibility requirements.

"e. implement an outreach and education program which includes an aggressive recruiting component to assure that all disadvantaged businesses which might be eligible to compete for Ohio's contracting and procurement dollars become certified to do so;

"f. establish a system to assist all other cabinet-level state agencies in identifying and utilizing HUBs in their contracting processes; and

"g. implement a system of self reporting as well as periodic on site inspections which will ensure that businesses registered as HUBs are actually owned and operated by individuals who are economically and socially disadvantaged; and

"h. provide to me, by December 31, 1997, and by December 31 of each year thereafter, a detailed report outlining and evaluating progress made in implementing this executive order.

"3. The Department of Development shall assist in the outreach and recruitment of HUBs and shall provide assistance to The Department of Administrative Services' Equal Opportunity Division as needed in certifying new HUBs. Provide business development services to HUBs in the developmental and transitional stages of the program. The Department of Development shall also provide a report to me, by December 31, 1997, and by December 31 each year thereafter on their progress of assisting in the implementation of this executive order.

"4. Every Cabinet-Level State Agency shall, within the constraints of statutory authority and as otherwise provided by law:

"a. take appropriate steps to foster, support and encourage the participation of historically underutilized businesses and encourage such businesses to compete for construction contracts and the procurement of goods and services;

certification of disadvantaged business enterprises (now called "historically underutilized business enterprises") on the basis of social and economic disadvantage. Appellee claims that "[t]hese current policy changes in compliance with *Adarand* are admissions by the State that it recognizes the United States Supreme Court dictate that 'disadvantaged business' programs must be based on social and economic disadvantage, and not on race *per se*." However, these executive orders deal with policies that differ from the nature and purpose of the MBE program. ODAS contends, and we agree, that the former Governor's programs merely supplement, but do not supplant, the MBE program. Moreover, we do not view these executive orders as supporting the conclusions that appellee attempts to draw from them. As we indicated in our discussion immediately above, *Adarand* holds that all racial classifications, whether imposed by federal, state, or local government, are subject to strict scrutiny. *Id*., 515 U.S. at 227, 115 S.Ct. at 2113, 132 L.Ed.2d at 182. By virtue of the decision in *Richmond v. J.A. Croson Co*. (1989), 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854, it has been known since *1989* that Ohio's MBE program, if challenged, would be subject to strict scrutiny. See our discussion in Part II, below. *Adarand* merely placed the *federal government* in the same boat as state and local governments in terms of the applicability of strict scrutiny to benign or remedial race-based governmental actions. Therefore, for this and other reasons, appellee's claim that the former Governor's executive orders were a measured response to the *Adarand* decision is unconvincing.

---

"b.  cooperate with The Department of Administrative Services' Equal Opportunity Division and the Department of Development in identifying and developing HUBs; and

"c.  beginning in 1997, set a goal that 5% of their available contracting dollars in the areas of construction, goods, and services, be awarded through an open and competitive process to HUBs; and

"d.  provide The Department of Administrative Services' Equal Opportunity Division with quarterly reports on HUB utilization.

"Effective with this order, I revoke all Executive Orders issued which are inconsistent with this Order."

{¶ 33} As to ODAS's second proposition of law, appellee contends that the question whether Ritchey is Oriental is irrelevant, since, according to appellee, *Adarand* requires that businesses must be admitted into the program on the basis of actual and social economic disadvantage. Appellee also claims that "Ritchey qualifies under the definition of 'Oriental' as originally reviewed and certified by the State, or as should be properly administered now." Therefore, appellee maintains that Ritchey is Oriental, even though Ritchey admitted to the trial court's magistrate that he is not Oriental.

{¶ 34} To complicate matters further, *amici* enter the fray by urging us to consider ODAS's propositions of law in reverse order, *i.e.*, to address the second proposition of law first, and the first proposition of law second. With respect to ODAS's second proposition of law, *amici* claim that Ritchey is Oriental—although he clearly is not. Nevertheless, *amici* urge that construing the term "Orientals" in R.C. 122.71(E)(1) in accordance with rules of grammar and common usage, the term clearly includes within its meaning individuals of Lebanese descent. With respect to ODAS's first proposition of law, *amici* urge us to uphold R.C. 122.71(E)(1) as a constitutional exercise of legislative authority.

{¶ 35} In reply to the arguments of appellee and of appellee's supporting *amici*, ODAS points out that appellee's arguments in this case have been specifically calibrated "to save the program for [appellee's] benefit, while disregarding the impact on all other MBEs—that is, if [appellee] cannot be certified under the existing program, then no company can." ODAS notes that the controversy in this case arose simply because ODAS had adhered to the plain language of R.C. 122.71(E)(1) in denying appellee's application for recertification. ODAS observes that, despite this fact, appellee now "argues that the facial validity of the MBE program is not at issue" and "that the only constitutional question before the Court is whether the statute is constitutional as applied only to it." ODAS contends that appellee's arguments indicate that appellee "does not seek to

participate in the Ohio MBE program as that program is statutorily structured and as it is currently applied," and that "[i]nstead, Ritchey asks the Court to grant him the benefit of a *different* program, one that would rely not on his race, but on his economic or social disadvantage, presumably arising in some way from his race." (Emphasis *sic*.) We agree with ODAS's summary:

"In the final analysis, the semantics of whether the Court of Appeals decision presents a 'facial' or 'as applied' constitutional challenge to the MBE program are not critical. Nor is it critical for the Court to consider the issues presented in a particular order. What is critical is for the Court to consider, in full view, the State's compelling interest in redressing state-sponsored racial discrimination and its narrow tailoring of a program [the MBE program] to meet that interest."

## II

{¶ 36} Having set forth the arguments raised in this appeal, we now consider the precedents governing the determination whether Ohio's MBE program, specifically, R.C. 122.71(E)(1), violates the Equal Protection Clause of the Fourteenth Amendment. For the past twenty years, the United States Supreme Court has struggled with the tension between the Fourteenth Amendment guarantee of equal protection of citizens and the use of race-based measures imposed by governmental actors to ameliorate the effects of past discrimination on minority groups in society. Beginning with *Regents of the Univ. of California v. Bakke* (1978), 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750, and continuing through *Adarand*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158, the United States Supreme Court has written volumes on the subject. Over the course of the years, the court resolved the once-embattled question concerning the appropriate standard of review for benign or remedial race-based governmental action, finding that the standard for all governmental classifications based on race is the strict scrutiny standard of review. See *Adarand*, 515 U.S. at 227, 115 S.Ct. at 2113, 132 L.Ed.2d

at 182.  See, also, *Croson*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854.  However, any discussion of benign or remedial race-based governmental action would be incomplete without a full review of the United States Supreme Court's major pronouncements on the issue beginning with the court's 1978 landmark decision in *Bakke*.

{¶ 37} As we enter into our review of the opinions of the United States Supreme Court on the subject of remedial race-based governmental action, we first note that the cases are both difficult and complex.  In conducting our analysis, we set forth a summary of the high court's pronouncements.  While our discussion tends to be lengthy, we find it necessary for our decisionmaking in this case.

{¶ 38} The issue in *Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750, involved a special admissions program of the Medical School of the University of California at Davis.  The special admissions program was designed by the faculty to ensure the admission of a specified number of disadvantaged students from certain minority groups.  The special program operated in coordination with a regular admissions program.  When *Bakke* was decided, no disadvantaged Caucasian applicants had ever been admitted to medical school under the special admissions program, though many apparently had applied.  Allan Bakke, a white male, applied for admission to the medical school in 1973 and 1974.  In both years, Bakke's application was reviewed under the regular admissions program and was rejected.  In both years, applicants from the special program were admitted with scores lower than Bakke's.  After the second rejection, Bakke filed suit in state court, seeking declaratory and injunctive relief, claiming, among other things, that the special admissions program had operated to exclude him from medical school on the basis of his race in violation of the equal protection guarantees of the Fourteenth Amendment.

{¶ 39} Bakke won a hollow victory at the trial court level.  The trial court held that the challenged admissions program was unconstitutional and that the

medical school could not consider race as part of its admissions decisions. However, the trial court refused to order Bakke's admission, finding that Bakke had failed to prove that he would have been admitted but for the special program. The state Supreme Court, applying the strict scrutiny standard of review, affirmed the trial court's finding that the special admissions program violated the Equal Protection Clause but also directed the trial court to order Bakke's admission to the school. Thereafter, the United States Supreme Court granted certiorari to consider the constitutional issue.

{¶ 40} In *Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750, the United States Supreme Court affirmed the judgment of the state Supreme Court that Bakke was entitled to admission, but reversed insofar as the courts below had prohibited the school from establishing a race-conscious program in the future. *Bakke* resulted in many different opinions of the Justices, with no single opinion speaking for the court. However, in Justice Powell's opinion announcing the judgment in *Bakke*, in a section joined by Justice White, he rejected an argument that strict scrutiny should be reserved for classifications that disadvantage "discrete and insular minorities." *Id*. at 287-291, 98 S.Ct. at 2746-2748, 57 L.Ed.2d at 769-771. In the same section, Justice Powell stated, "The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color. If both are not accorded the same protection, then it is not equal." *Id*. at 289-290, 98 S.Ct. at 2748, 57 L.Ed.2d at 770-771. Justice Powell also determined that racial and ethnic distinctions of any sort are "inherently suspect and thus call for the most exacting judicial examination." *Id*. at 291, 98 S.Ct. at 2748, 57 L.Ed.2d at 771. Additionally, Justice Powell, speaking for himself, observed that where a classification touches upon an individual's race or ethnic background, that person "is entitled to a judicial determination that the burden he is asked to bear on that basis is *precisely tailored to serve a compelling*

*governmental interest*." (Emphasis added.) *Id*. at 299, 98 S.Ct. at 2753, 57 L.Ed.2d at 777.

{¶ 41} Justice Powell's opinion in *Bakke* is of great historic significance in that it built a foundation upon which the court's future cases would be grounded. Therefore, a detailed discussion of that opinion is in order.

{¶ 42} Justice Powell's opinion in *Bakke* considered four possible objectives of the special admissions program, none of which was found to justify the program under strict scrutiny. *Id*., 438 U.S. at 305-319, 98 S.Ct. at 2756-2763, 57 L.Ed.2d at 781-789. With respect to the first asserted purpose (reducing the historic deficit of minorities in medical schools and the medical profession), Justice Powell noted, "Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake." *Id*. at 307, 98 S.Ct. at 2757, 57 L.Ed.2d at 782.

{¶ 43} As to the second purpose asserted in *Bakke* to justify the special admissions program (counteracting "societal discrimination"), Justice Powell observed that a state clearly has an interest in ameliorating the effects of *identified* discrimination but that the goal of remedying the effects of historic societal discrimination, "an amorphous concept of injury that may be ageless in its reach into the past," did not justify imposing a burden on Bakke. *Id*., 438 U.S. at 307, 307-310, 98 S.Ct. at 2757, 2757-2758, 57 L.Ed.2d at 782, 782-784. Justice Powell stated, "We have never approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations." *Id*. at 307, 98 S.Ct. at 2757, 57 L.Ed.2d at 782. He also stated that only after such findings are made can a governmental classification preferring members of the injured groups at the expense of others be justified as remedial, and that, in such cases, the extent of the injury and the scope of the remedy will have been appropriately defined. *Id*. at 307-308, 98 S.Ct. at

2757, 57 L.Ed.2d at 782. He stated that absent such findings of statutory or constitutional violations, "it cannot be said that the government has any greater interest in helping one individual than in refraining from harming another," and the government would therefore have no compelling justification for inflicting such harm. *Id*. at 308-309, 98 S.Ct. at 2757-2758, 57 L.Ed.2d at 782-783. Justice Powell went on to say, "[A] governmental body must have the authority and capability to establish, in the record, that the classification is responsive to identified discrimination." *Id*. at 309, 98 S.Ct. at 2758, 57 L.Ed.2d at 783. He concluded that because the medical school had made no explicit findings of identifiable discrimination, and since the school's mission was education and not the formulation of any legislative policy or the adjudication of particular claims of illegality, the petitioner had failed to carry its burden of justification on that issue. *Id*. at 309-310, 98 S.Ct. at 2758, 57 L.Ed.2d at 783.

{¶ 44} With respect to the third purpose asserted by the petitioner in *Bakke* to justify the special admissions program (to increase the number of doctors serving disadvantaged communities), Justice Powell concluded that the petitioner had made no showing that the special admissions program was either needed or geared to promote that goal. *Id*., 438 U.S. at 310-311, 98 S.Ct. at 2758-2759, 57 L.Ed.2d at 784. As to the fourth asserted objective for the program (attainment of an ethnically diverse student population), Justice Powell noted that although the medical school had a compelling interest in achieving a diverse student body, the means it had chosen to effectuate that goal—*i.e*., a fixed admissions quota system—was not appropriate. *Id*. at 311-320, 98 S.Ct. at 2759-2763, 57 L.Ed.2d at 785-790.

{¶ 45} In his opinion in *Bakke*, Justice Powell concluded, "The fatal flaw in petitioner's preferential program is its disregard of individual rights as guaranteed by the Fourteenth Amendment. * * * Such rights are not absolute. But when a State's distribution of benefits or imposition of burdens hinges on ancestry or the color of a person's skin, that individual is entitled to a demonstration that the

challenged classification is necessary to promote a substantial state interest. Petitioner has failed to carry this burden." *Id*. at 320, 98 S.Ct. at 2763, 57 L.Ed.2d at 790. Therefore, on that basis, Justice Powell found that it was necessary to affirm the portion of the California court's judgment that had invalidated the special admissions program under the Fourteenth Amendment. *Id*. That conclusion, when coupled with the views expressed in the opinion of Justice Stevens (see discussion below), provided a clear majority in *Bakke* for invalidating the special admissions program. However, Justice Powell (joined by Justices Brennan, White, Marshall, and Blackmun) found that by prohibiting petitioner from considering the race of any applicant as a factor in admissions, the California courts had failed to recognize that "the State has a substantial interest that legitimately may be served by a properly devised admissions program involving the competitive consideration of race and ethnic origin." *Id*. at 320, 98 S.Ct. at 2763, 57 L.Ed.2d at 790. For that reason, it was determined that "so much of the California court's judgment as enjoins petitioner from any consideration of the race of any applicant must be reversed." *Id*. Finally, on the question of Bakke's right to an injunction requiring his admission to the medical school, Justice Powell announced the judgment affirming that aspect of the state court's decision. *Id*. at 320, 98 S.Ct. at 2763-2764, 57 L.Ed.2d at 790.

{¶ 46} As previously stated, *Bakke* produced many opinions by the Justices, but no single opinion on behalf of the court. Thus, Justice Powell's opinion on the constitutional question spoke only of Justice Powell's own views of the case, except in certain limited instances. In addition to Justice Powell's opinion, four Justices in *Bakke* found that a less stringent standard of review should be applied to racial classifications that have been designed to further remedial purposes and, in applying that standard, found that the special admissions program was constitutional in all respects. *Id*., 438 U.S. at 324-379, 98 S.Ct. at 2765-2794, 57 L.Ed.2d at 792-827 (Brennan, White, Marshall, and Blackmun, JJ., concurring in

judgment in part and dissenting in part). The less stringent standard proposed by these four Justices was an intermediate level of scrutiny — *i.e.*, racial classifications designed to further remedial purposes must serve important governmental objectives and must be substantially related to the achievement of those objectives. *Id*. at 359, 98 S.Ct. at 2783, 57 L.Ed.2d at 814. Conversely, four other Justices in *Bakke* would have decided the case by affirming the judgment of the Supreme Court of California solely on statutory grounds, finding that the program violated Title VI of the Civil Rights of 1964 by excluding Bakke from the medical school on the basis of race. *Id*., 438 U.S. at 408-421, 98 S.Ct. at 2808-2815, 57 L.Ed.2d at 845-853 (Stevens, J., joined by Burger, C.J., Stewart, and Rehnquist, JJ., concurring in judgment in part and dissenting in part). Thus, in 1978, *Bakke* provided limited guidance to the nation on the constitutionality of purportedly remedial race-based governmental action.

{¶ 47} Two years later, in 1980, the United States Supreme Court confronted a case involving a congressional spending program that established a remedial set-aside plan for the benefit of minority business enterprises. Specifically, in *Fullilove v. Klutznick* (1980), 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902, the court considered a facial challenge to the constitutionality of the MBE provision of the Public Works Employment Act of 1977. The MBE provision required that absent an administrative waiver, at least ten percent of federal funds granted for local public works projects were to be used by the state or local grantee to procure services or supplies from business enterprises owned and controlled by minority group members. For purposes of the provision, minority group members were defined as citizens of the United States who were "Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts." Section 6705(f)(2), Title 42, U.S.Code. The petitioners in *Fullilove* challenged the MBE provision in federal district court, claiming, among other things, that the MBE provision violated the Equal Protection Clause of the Fourteenth Amendment and the equal protection

component of the Due Process Clause of the Fifth Amendment. The federal district court and the United States Second Circuit Court of Appeals upheld the MBE provision as constitutional in all respects.

{¶ 48} In *Fullilove*, the vote of the United States Supreme Court was once again extremely fractured, and *Fullilove*, like *Bakke*, produced no majority opinion for the court. The lead opinion in *Fullilove* was authored by Chief Justice Burger and was joined by Justices White and Powell. That opinion explored, in detail, the legislative history of the federal MBE provision. The opinion noted that Congress had apparently believed that the provision requiring a ten-percent set-aside was necessary to ensure minority business participation in projects funded through the congressional spending program. *Id*., 448 U.S. at 462, 100 S.Ct. at 2766, 65 L.Ed.2d at 914. The opinion observed that absent such a requirement, "it was thought that repetition of the prior experience [of an earlier congressional spending package] could be expected, with participation by minority business accounting for an inordinately small percentage of government contracting." *Id*. at 462-463, 100 S.Ct. at 2766-2767, 65 L.Ed.2d at 914. Additionally, "[t]he causes of this disparity were perceived as involving the longstanding existence and maintenance of barriers impairing access by minority enterprises to public contracting opportunities, or sometimes as involving more direct discrimination, but not as relating to lack [as one Senator put it] 'of capable and qualified minority enterprises who are ready and willing to work.' In the words of its sponsor, the MBE provision was 'designed to begin to redress this grievance that has been extant for so long.' " (Footnotes omitted.) *Id*. at 463, 100 S.Ct. at 2767, 65 L.Ed.2d at 914.

{¶ 49} The lead opinion in *Fullilove* also reviewed the guidelines and policies that had been developed for administering the federal MBE program. Administrative regulations specified that where contractors were to be selected by state or local grantees through competitive bidding, bids for the prime contract were to be considered responsive only if at least ten percent of the contract funds were

to be expended for MBEs. Administrative guidelines had also been developed to ensure that waivers of the ten-percent set-aside requirement were to be granted on a case-by-case basis and upon a determination that, despite affirmative efforts, the required level of MBE participation could not be achieved. *Id*., 448 U.S. at 469-470 and 481-482, 100 S.Ct. at 2770 and 2776, 65 L.Ed.2d at 918-919 and 926. Administrative waivers were available to avoid subcontracting with MBEs at an unreasonable price, *i.e.*, prices exceeding competitive levels that could not be attributed to an MBE's attempt to cover costs inflated by the present effects of disadvantage or discrimination. *Id*. at 470-471, 100 S.Ct. at 2771, 65 L.Ed.2d at 919. In this regard, the lead opinion in *Fullilove* noted that the administrative policy was consistent with congressional intent, since the federal MBE program was meant to benefit MBEs whose competitive position had been impaired by the effects of disadvantage and discrimination. *Id*. at 471, 100 S.Ct. at 2771, 65 L.Ed.2d at 919.

**{¶ 50}** Additionally, in *Fullilove*, the administrative program ensured participation by only bona fide MBEs by specifying, among other things, that minority group ownership interests were to be " 'real and continuing and not created solely to meet 10% MBE requirements.' " *Id*. at 492, 100 S.Ct. at 2782, 65 L.Ed.2d at 933, quoting Economic Development Administration guidelines. The program also contained a procedure governing complaints of "unjust participation" and, thus, established a mechanism to prevent participation in the MBE program by enterprises whose access to public contracting opportunities had not been impaired by the effects of prior discrimination. *Id*. at 482, 100 S.Ct. at 2776, 65 L.Ed.2d at 926. Further, the administrative program clarified the definition of minority group members by specifically defining, *e.g*., "Oriental" as "[a]n individual of a culture, origin or parentage traceable to the areas south of the Soviet Union, East of Iran, * * * and out to the Pacific including but not limited to Indonesia, Indochina,

Malaysia, Hawaii and the Philippines." *Id*. at 495, 100 S.Ct. at 2783, 65 L.Ed.2d at 935.

{¶ 51} On the basis of the regulations and guidelines governing the administration of the federal MBE program, the lead opinion in *Fullilove* found that Congress had enacted the program as a "strictly remedial measure." *Id*. at 481, 100 S.Ct. at 2776, 65 L.Ed.2d at 926. The opinion states, "The clear objective of the MBE provision is disclosed by our necessarily extended review of its legislative and administrative background. The program was designed to ensure that, to the extent federal funds were granted under the Public Works Employment Act of 1977, grantees who elect to participate would not employ procurement practices that Congress had decided might result in perpetuation of the effects of prior discrimination which had impaired or foreclosed access by minority businesses to public contracting opportunities. The MBE program does not mandate the allocation of federal funds according to inflexible percentages solely based on race or ethnicity." *Id*. at 473, 100 S.Ct. at 2772, 65 L.Ed.2d at 921.

{¶ 52} The lead opinion in *Fullilove* went on to address whether the objectives of the federal MBE program were within the scope of the congressional spending power and concluded that insofar as the MBE program pertained to the actions of state and local grantees, Congress's objectives could have been achieved by use of its power under Section 5 of the Fourteenth Amendment "to enforce, by appropriate legislation," the equal protection guarantees of that Amendment. *Id*., 448 U.S. at 476, 100 S.Ct. at 2773-2774, 65 L.Ed.2d at 923. In this regard, the opinion states:

"With respect to the MBE provision, Congress had abundant evidence from which it could conclude that minority businesses have been denied effective participation in public contracting opportunities by procurement practices that perpetuated the effects of prior discrimination. Congress, of course, may legislate without compiling the kind of 'record' appropriate with respect to judicial or

administrative proceedings. Congress had before it, among other data, evidence of a long history of marked disparity in the percentage of public contracts awarded to minority business enterprises. This disparity was considered to result not from any lack of capable and qualified minority businesses, but from the existence and maintenance of barriers to competitive access which had their roots in racial and ethnic discrimination, and which continue today, even absent any intentional discrimination or other unlawful conduct. Although much of this history related to the experience of minority businesses in the area of federal procurement, there was direct evidence before the Congress that this pattern of disadvantage and discrimination existed with respect to state and local construction contracting as well. In relation to the MBE provision, Congress acted within its competence to determine that the problem was national in scope.

"Although the Act recites no preambulary 'findings' on the subject, we are satisfied that Congress had abundant historical basis from which it could conclude that traditional procurement practices, when applied to minority businesses, could perpetuate the effects of prior discrimination. Accordingly, Congress reasonably determined that the prospective elimination of these barriers to minority firm access to public contracting opportunities generated by the 1977 Act was appropriate to ensure that those businesses were not denied equal opportunity to participate in federal grants to state and local governments, which is one aspect of the equal protection of the laws. Insofar as the MBE program pertains to the actions of state and local grantees, Congress could have achieved its objectives by use of its power under §5 of the Fourteenth Amendment. We conclude that in this respect the objectives of the MBE provision are within the scope of the Spending Power." *Id.*, 448 U.S. at 477-478, 100 S.Ct. at 2774-2775, 65 L.Ed.2d at 924.

{¶ 53} The lead opinion in *Fullilove* then turned to the question whether the means that had been chosen by Congress to accomplish its objectives were constitutionally permissible. *Id.* at 480, 100 S.Ct. at 2775, 65 L.Ed.2d at 925. On

this question, the opinion noted that "Congress may employ racial or ethnic classifications in exercising its Spending or other legislative powers only if those classifications do not violate the equal protection component of the Due Process Clause of the Fifth Amendment." *Id*. at 480, 100 S.Ct. at 2775, 65 L.Ed.2d at 925. It also pointed out "the need for careful judicial evaluation to assure that any congressional program that employs racial or ethnic criteria to accomplish the objective of remedying the present effects of past discrimination is narrowly tailored to the achievement of that goal." *Id*. at 480, 100 S.Ct. at 2775-2776, 65 L.Ed.2d at 925.

{¶ 54} En route to upholding the MBE provision as constitutional, the lead opinion in *Fullilove* addressed and rejected the concept that, in the remedial context, Congress must act in a colorblind fashion. *Id*., 448 U.S. at 482, 100 S.Ct. at 2776, 65 L.Ed.2d at 926-927. It also rejected arguments that the MBE program impermissibly deprived nonminority businesses of access to a portion of governmental contracting opportunities, that the MBE provision was underinclusive, and that the provision was overinclusive. *Id*. at 484-489, 100 S.Ct. at 2777-2780, 65 L.Ed.2d at 928-931.

{¶ 55} With respect to the argument that the program would impermissibly deprive nonminority businesses of access to some percentage of the public contracting opportunities, the lead opinion in *Fullilove* determined that it was "not a constitutional defect in this program that it may disappoint the expectations of nonminority firms," since "[w]hen effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such a 'sharing of the burden' by innocent parties is not impermissible." *Id*., 448 U.S. at 484, 100 S.Ct. at 2778, 65 L.Ed.2d at 928. Additionally, the lead opinion observed that "[t]he actual 'burden' shouldered by nonminority firms is relatively light in this connection when we consider the scope of this public works program as compared with overall construction contracting opportunities." *Id*. Further, the opinion noted that the

burden placed on nonminority firms was merely an "incidental consequence" of the MBE program—not part of the program's objective. *Id*. Moreover, the lead opinion states, "although we may assume that the complaining parties are innocent of any discriminatory conduct, it was within congressional power to act on the assumption that in the past some nonminority businesses may have reaped competitive benefit over the years from the virtual exclusion of minority firms from these contracting opportunities." *Id*. at 484-485, 100 S.Ct. at 2778, 65 L.Ed.2d at 928.

{¶ 56} With regard to the argument that the MBE provision was underinclusive (*i.e*., that it benefited only specified minority groups and not other businesses that may have suffered from disadvantage or discrimination), the lead opinion in *Fullilove* concluded that any expansion of the program was "not a function for the courts." *Id*., 448 U.S. at 485, 100 S.Ct. at 2778, 65 L.Ed.2d at 929. The opinion noted, "The Congress has not sought to give select minority groups a preferred standing in the construction industry, but has embarked on a remedial program to place them on a more equitable footing with respect to public contracting opportunities. There has been no showing in this case that Congress has inadvertently effected an invidious discrimination by excluding from coverage an identifiable minority group that has been the victim of a degree of disadvantage and discrimination equal to or greater than that suffered by the groups encompassed by the MBE program. It is not inconceivable that on very special facts a case might be made to challenge the congressional decision to limit MBE eligibility to the particular minority groups identified in the Act. * * * But on this record we find no basis to hold that Congress is without authority to undertake the kind of limited remedial effort represented by the MBE program. Congress, not the courts, has the heavy burden of dealing with a host of intractable economic and social problems." *Id*. at 485-486, 100 S.Ct. at 2778-2779, 65 L.Ed.2d at 929.

**{¶ 57}** As to the claim that the MBE provision was overinclusive, the lead opinion in *Fullilove* states:

"It is also contended that the MBE program is overinclusive—that it bestows a benefit on businesses identified by racial or ethnic criteria which cannot be justified on the basis of competitive criteria or as a remedy for the present effects of identified prior discrimination. It is conceivable that a particular application of the program may have this effect; however, the peculiarities of specific applications are not before us in this case. We are not presented here with a challenge involving a specific award of a construction contract or the denial of a waiver request; such questions of specific application must await future cases.

"This does not mean that the claim of overinclusiveness is entitled to no consideration in the present case. The history of governmental tolerance of practices using racial or ethnic criteria for the purpose or with the effect of imposing an invidious discrimination must alert us to the deleterious effects of even benign racial or ethnic classifications when they stray from narrow remedial justifications. Even in the context of a facial challenge such as is presented in this case, the MBE provision cannot pass muster unless, with due account for its administrative program, it provides a reasonable assurance that application of racial or ethnic criteria will be limited to accomplishing the remedial objectives of Congress and that misapplications of the program will be promptly and adequately remedied administratively.

"It is significant that the administrative scheme provides for waiver and exemption. Two fundamental congressional assumptions underlie the MBE program: (1) that the present effects of past discrimination have impaired the competitive position of businesses owned and controlled by members of minority groups; and (2) that affirmative efforts to eliminate barriers to minority-firm access, and to evaluate bids with adjustment for the present effects of past discrimination, would assure that at least 10% of the federal funds granted under the Public Works

Employment Act of 1977 would be accounted for by contracts with available, qualified, bona fide minority business enterprises. Each of these assumptions may be rebutted in the administrative process.

"The administrative program contains measures to effectuate the congressional objective of assuring legitimate participation by disadvantaged MBE's. Administrative definition has tightened some less definite aspects of the statutory identification of the minority groups encompassed by the program. There is administrative scrutiny to identify and eliminate from participation in the program MBE's who are not 'bona fide' within the regulations and guidelines; for example, spurious minority-front entities can be exposed. A significant aspect of this surveillance is the complaint procedure available for reporting 'unjust participation by an enterprise or individuals in the MBE program.' * * * And even as to specific contract awards, waiver is available to avoid dealing with an MBE who is attempting to exploit the remedial aspects of the program by charging an unreasonable price, *i.e.*, a price not attributable to the present effects of past discrimination. * * * We must assume that Congress intended close scrutiny of false claims and prompt action on them.

"Grantees are given the opportunity to demonstrate that their best efforts will not succeed or have not succeeded in achieving the statutory 10% target for minority firm participation within the limitations of the program's remedial objectives. In these circumstances a waiver or partial waiver is available once compliance has been demonstrated. A waiver may be sought and granted at any time during the contracting process, or even prior to letting contracts if the facts warrant.

"* * *

"That the use of racial and ethnic criteria is premised on assumptions rebuttable in the administrative process gives reasonable assurance that application of the MBE program will be limited to accomplishing the remedial objectives

contemplated by Congress and that misapplications of the racial and ethnic criteria can be remedied. In dealing with this facial challenge to the statute, doubts must be resolved in support of the congressional judgment that this limited program is a necessary step to effectuate the constitutional mandate for equality of economic opportunity. The MBE provision may be viewed as a pilot project, appropriately limited in extent and duration, and subject to reassessment and reevaluation by the Congress prior to any extension or reenactment. Miscarriages of administration could have only a transitory economic impact on businesses not encompassed by the program, and would not be irremediable." (Footnotes omitted.) *Id*., 448 U.S. at 486-489, 100 S.Ct. at 2779-2780, 65 L.Ed.2d at 929-931.

**{¶ 58}** The lead opinion in *Fullilove* determined that "[f]or its part, the Congress must proceed only with programs narrowly tailored to achieve its objectives, subject to continuing evaluation and reassessment; administration of the programs must be vigilant and flexible; and, when such a program comes under judicial review, courts must be satisfied that the legislative objectives and projected administration give reasonable assurance that the program will function within constitutional limitations." *Id*. at 490, 100 S.Ct. at 2781, 65 L.Ed.2d at 932. Additionally, the opinion notes, "Any preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees." *Id*. at 491, 100 S.Ct. at 2781, 65 L.Ed.2d at 933. The lead opinion did not, however, "adopt, either expressly or implicitly, the formulas of analysis articulated in such cases as [*Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750]." *Fullilove* at 492, 100 S.Ct. at 2781, 65 L.Ed.2d at 933. Nevertheless, the lead opinion specifically states that "our analysis demonstrates that the MBE provision *would survive judicial review under either 'test' articulated in the several Bakke opinions*." (Emphasis added.) *Fullilove* at 492, 100 S.Ct. at 2781, 65 L.Ed.2d at 933.

**{¶ 59}** As previously noted, *Fullilove* did not produce a majority opinion for the court. In addition to Chief Justice Burger's lead opinion (joined by Justices White and Powell), Justice Powell wrote a separate concurring opinion, in which he expressed the view that the lead opinion *was substantially in accordance with his own views that strict scrutiny applied to the racial classification of the federal MBE provision* and that, for all practical purposes*, the lead opinion had applied that standard correctly*. *Id*., 448 U.S. at 495-496, 100 S.Ct. at 2783-2784, 65 L.Ed.2d at 935. Justice Powell stated that the applicable standard is whether a racial classification "is a necessary means of advancing a compelling governmental interest." *Id*. at 496, 100 S.Ct. at 2783-2784, 65 L.Ed.2d at 935. He concluded, therefore, that the racial classification at issue was justified as a narrowly tailored remedy serving the compelling governmental interest in eradicating and repairing the continuing effects of past *unlawful* discrimination *identified* by Congress—even though, incidentally, there was never any explicit or formal congressional findings of illegal discrimination in the form of statutory or constitutional violations. See, generally, *id*. at 496-507, 100 S.Ct. at 2784-2789, 65 L.Ed.2d at 936-943.

**{¶ 60}** Additionally, in *Fullilove*, Justice Marshall, joined by Justices Brennan and Blackmun, concurred in judgment and wrote separately to express the view that the analysis of their joint separate opinion in *Bakke*, joined also by Justice White, 438 U.S. at 324-379, 98 S.Ct. at 2765-2794, 57 L.Ed.2d at 792-827, controlled the resolution of the question whether the federal MBE provision was constitutional. 448 U.S. at 517-522, 100 S.Ct. at 2794-2797, 65 L.Ed.2d at 949-953. Specifically, Justice Marshall argued that "the proper inquiry is whether racial classifications designed to further remedial purposes serve important governmental objectives and are substantially related to achievement of those objectives," and in applying that standard, he concluded that the federal MBE provision was "plainly constitutional." *Id*. at 519, 100 S.Ct. at 2796, 65 L.Ed.2d at 951.

**{¶ 61}** Justice Stewart, joined by Justice Rehnquist, dissented. *Id*. at 522-532, 100 S.Ct. at 2797-2803, 65 L.Ed.2d at 953-959. He argued that the equal protection standard is the same for state and federal governments, that the single standard prohibits invidious discrimination, that all discrimination is invidious by definition, and that the federal MBE provision was unconstitutional because it granted preferences to certain groups on the basis of race. *Id*., 448 U.S. at 523 and 526-532, 100 S.Ct. at 2798 and 2799-2803, 65 L.Ed.2d at 953 and 955-959.

**{¶ 62}** Justice Stevens also dissented in *Fullilove*, urging that "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification," and that the MBE provision was a "slapdash" statute providing classwide relief that could not be characterized as a narrowly tailored remedy. *Id*. at 537, 539 and 541, 100 S.Ct. at 2805, 2806 and 2807, 65 L.Ed.2d at 962, 963 and 965.

**{¶ 63}** Several years after *Fullilove*, the court, in 1986, decided *Wygant v. Jackson Bd. of Edn*. (1986), 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260. At issue in *Wygant* was a layoff provision in a collective bargaining agreement between a local school board and a teachers' union. The provision required that if layoffs became necessary, teachers with the most seniority would be retained, except that at no time would there be a greater percentage of minority personnel laid off than the current percentage of minority personnel at the time of the layoff. Minorities were defined in the agreement as employees who were Black, American Indian, Oriental, or of Spanish descent. In 1974, during a round of layoffs, the board did not comply with the provision. However, after the layoff provision was upheld in litigation arising from the board's noncompliance with its terms, the board began adhering to the provision. As a result, during the 1976-1977 and 1981-1982 school years, nonminority teachers were laid off, while minority teachers with less seniority were retained.

{¶ 64} In *Wygant*, the displaced nonminority teachers sued in federal district court, alleging violations of, among other things, the Equal Protection Clause of the Fourteenth Amendment. The district court upheld the constitutionality of the school board's race-based layoffs. The district court found that the racial preferences granted by the school board need not have been grounded on a finding of prior discrimination, and that the racial preferences were permissible under the Equal Protection Clause as an attempt to remedy societal discrimination by providing role models for minority schoolchildren. On appeal, the United States Sixth Circuit Court of Appeals affirmed the judgment of the district court. Thereafter, the United States Supreme Court granted certiorari to consider the constitutionality of race-based layoffs by public employers and reversed the judgment of the court of appeals.

{¶ 65} In *Wygant*, the United States Supreme Court was once again unable to produce a majority opinion. Rather, Justice Powell wrote a plurality opinion, which was joined in full by Chief Justice Burger and by Justice Rehnquist, and in all but one part by Justice O'Connor.[5] The plurality phrased the issue in *Wygant* as "whether a school board, consistent with the Equal Protection Clause, may extend preferential protection against layoffs to some of its employees because of their race or national origin." *Id*., 476 U.S. at 269-270, 106 S.Ct. at 1844-1845, 90 L.Ed.2d at 266.

{¶ 66} In *Wygant*, Justice Powell's plurality opinion observed that "the level of scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination." *Id*. at 273, 106 S.Ct. at 1846, 90 L.Ed.2d at 268. Therefore, recognizing that the layoff provision established a classification based on race and

---

5. All future references to the plurality in *Wygant v. Jackson Bd. of Edn*. (1986), 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260, are to the plurality consisting of Chief Justice Burger and Justices Powell, Rehnquist, and O'Connor, unless otherwise indicated.

that it had operated against whites and in favor of certain minorities, the plurality conducted a searching examination of the classification to determine whether it conflicted with equal protection guarantees. The plurality noted that there are two prongs to this examination: (1) whether the racial classification could be justified by a compelling governmental interest and (2) whether the means chosen by the state to effectuate its objective were narrowly tailored to the achievement of that goal. *Id*. at 274, 106 S.Ct. at 1847, 90 L.Ed.2d at 268. The plurality stated, "We must decide whether the layoff provision is supported by a compelling state purpose and whether the means chosen to accomplish that purpose are narrowly tailored." *Id*.

{¶ 67} The plurality in *Wygant*, employing strict scrutiny, rejected the conclusion of the Sixth Circuit (and that of the district court) that the respondent's "interest in providing minority role models for its minority students, as an attempt to alleviate the effects of societal discrimination, was sufficiently important to justify the racial classification embodied in the layoff provision." *Id*., 476 U.S. at 274, 106 S.Ct. at 1847, 90 L.Ed.2d at 269. The plurality observed that the Sixth Circuit had "discerned a need for more minority faculty role models by finding that the percentage of minority teachers was less than the percentage of minority students." *Id*. at 274, 106 S.Ct. at 1847, 90 L.Ed.2d at 269. However, the plurality noted, "This Court has never held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." *Id*. The plurality stated, "[T]he relevant analysis in cases involving proof of discrimination by statistical disparity focuses on those disparities that demonstrate such prior governmental discrimination." *Id*. The plurality pointed out that the appropriate statistical comparison for purposes of determining actual discrimination would have been a comparison between the racial composition of the teaching staff and

the racial composition of the qualified public school teacher population in the relevant labor market. *Id*. at 274-275, 106 S.Ct. at 1847, 90 L.Ed.2d at 269. Thus, the plurality found that the statistical disparity relied on by the district and appellate courts had no probative value in demonstrating that past discriminatory hiring practices by the school board had occurred. *Id*. at 276, 106 S.Ct. at 1848, 90 L.Ed.2d at 270. Therefore, the role model theory relied on by the district and appellate courts gave no basis for believing that prior discriminatory practices by the school board had occurred and, further, had no relation to the harm caused by any prior discriminatory hiring practices. *Id*. at 275-276, 106 S.Ct. at 1847-1848, 90 L.Ed.2d at 269-270; see, also, *Croson*, 488 U.S. at 497-498, 109 S.Ct. at 723-724, 102 L.Ed.2d at 884 (explaining the decision of the *Wygant* plurality). The plurality in *Wygant* observed, "[T]he role model theory employed by the District Court has no logical stopping point," and "allows the Board to engage in discriminatory hiring and layoff practices long past the point required by any legitimate remedial purpose." *Id*. at 275, 106 S.Ct. at 1847-1848, 90 L.Ed.2d at 269.

{¶ 68} Finding that "[s]ocietal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy," and that the role-model theory espoused by the district and appellate courts merely "typify this indefiniteness," the *Wygant* plurality determined that the role model justification for the race-based layoff provision was not sufficiently compelling. *Id*. at 276, 106 S.Ct. at 1848, 90 L.Ed.2d at 270. The plurality observed that there was no doubt that there had been serious racial discrimination in this country, but concluded that "as the basis for imposing discriminatory *legal* remedies that work against innocent people, societal discrimination is insufficient and overexpansive." (Emphasis *sic*.) *Id*. The plurality stated, "In the absence of particularized findings, a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future." *Id*.

{¶ 69} In *Wygant*, the school board also urged that the purpose in adopting the layoff provision was to remedy the board's own prior discriminatory hiring practices. The plurality in *Wygant* did not *specifically* determine whether that asserted remedial objective constituted a compelling state interest. *Id*., 476 U.S. at 278, 106 S.Ct. at 1849, 90 L.Ed.2d at 271. The plurality did indicate, however, that it was not fatal to the school board's asserted remedial justification that the board had never made any official predicate findings that the board had actually engaged in prior discriminatory practices. *Id*. at 277-278, 106 S.Ct. at 1848-1849, 90 L.Ed.2d at 270-271. See, also, *id*. at 289-293, 106 S.Ct. at 1855-1857, 90 L.Ed.2d at 278-281 (O'Connor, J., concurring in part and concurring in judgment). Rather, the plurality indicated that it was enough if the public employer had a *sufficient basis in evidence* to justify its conclusion that remedial action was necessary. *Id*. at 277, 106 S.Ct. at 1849, 90 L.Ed.2d at 271. Specifically, the plurality explained:

"[A] public employer like the Board must ensure that, before it embarks on an affirmative-action program, it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination.

"Evidentiary support for the conclusion that remedial action is warranted becomes crucial when the remedial program is challenged in court by nonminority employees. In this case, for example, petitioners contended at trial that the remedial program—Article XII—had the purpose and effect of instituting a racial classification that was not justified by a remedial purpose. * * * In such a case, *the trial court must make a factual determination* that the employer had a *strong basis in evidence* for its conclusion that remedial action was necessary. The ultimate burden remains with the employees to demonstrate the unconstitutionality of an affirmative-action program. But unless such a determination is made, an appellate court reviewing a challenge by nonminority employees to remedial action cannot determine whether the race-based action is justified as a remedy for prior

discrimination." (Emphasis added.) *Id*. at 277-278, 106 S.Ct. at 1848-1849, 90 L.Ed.2d at 271.

{¶ 70} The plurality in *Wygant* also observed that no such factual determination had ever been made in the case. *Id*., 476 U.S. at 278, 106 S.Ct. at 1849, 90 L.Ed.2d at 271. The school board protested, however, that it could, if given another opportunity, establish the existence of prior discrimination. In response to that argument, the plurality stated, "Although this argument seems belated at this point in the proceedings, we need not consider the question since we conclude below that the layoff provision was not a legally appropriate means of achieving even a compelling purpose." *Id*.

{¶ 71} Thereafter, the plurality, having never specifically answered the question whether the asserted objective of remedying the effects of the school board's own discriminatory hiring practices was sufficiently compelling, turned to the issue whether the means chosen by the school board for the achievement of that objective were narrowly tailored. *Id*. at 279-284, 106 S.Ct. at 1849-1852, 90 L.Ed.2d at 272-275. First, however, the plurality consisting of Burger, C.J., Powell and Rehnquist, JJ., noted that the court of appeals had reviewed the "means chosen to accomplish the Board's race-conscious purposes under a test of 'reasonableness.' " *Id*. at 279, 106 S.Ct. at 1849-1850, 90 L.Ed.2d at 272. The plurality observed that that standard had "no support in the decisions of this Court." *Id*. at 280, 106 S.Ct. at 1850, 90 L.Ed.2d at 272. Rather, the plurality noted, "[O]ur decisions always have employed a more stringent standard—however articulated—to test the validity of the means chosen by a State to accomplish its race-conscious purposes." *Id*. On the question of narrow tailoring, the plurality (consisting here of Burger, C.J., Powell and Rehnquist, JJ.) stated, "We have recognized * * * that in order to remedy the effects of prior discrimination, it may be necessary to take race into account. As part of this Nation's dedication to eradicating racial discrimination, innocent persons may be called upon to bear some of the burden of the remedy."

*Id*. at 280-281, 106 S.Ct. at 1850, 90 L.Ed.2d at 273.  However, this plurality found that there was a marked distinction between the burden shouldered by innocent parties in cases involving valid race-preference *hiring* goals and the far more intrusive burden imposed on innocent parties where loss of an existing job is concerned.  *Id*. at 282-283, 106 S.Ct. at 1851, 90 L.Ed.2d at 274.  This plurality explained:

"While hiring goals impose a diffuse burden, often foreclosing only one of several opportunities, layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives.  That burden is too intrusive.  We therefore hold that, as a means of accomplishing purposes that otherwise may be legitimate, the Board's layoff plan is not sufficiently narrowly tailored.  Other, less intrusive means of accomplishing similar purposes—such as the adoption of hiring goals—are available.  For these reasons, the Board's selection of layoffs as the means to accomplish even a valid purpose cannot satisfy the demands of the Equal Protection Clause."  (Footnotes omitted.) *Id*. at 283-284, 106 S.Ct. at 1852, 90 L.Ed.2d at 274-275.

{¶ 72} Justice O'Connor wrote a separate opinion concurring in part and concurring in judgment.  *Id*., 476 U.S. at 284-294, 106 S.Ct. at 1852-1858, 90 L.Ed.2d at 275-282.  Additionally, Justice White concurred in judgment only and wrote separately to express his views that none of the interests asserted by the school board, taken singly or together, justified the board's layoff policy.  *Id*. at 294-295, 106 S.Ct. at 1858, 90 L.Ed.2d at 282.

{¶ 73} The remaining four Justices dissented.  Justice Marshall, joined by Justices Brennan and Blackmun, argued for the application of a less exacting, intermediate level of review for remedial race-based governmental classifications. *Id*., 476 U.S. at 301-302, 106 S.Ct. at 1861, 90 L.Ed.2d at 286.  Justice Stevens, in a separate dissenting opinion, stated that the purpose of the layoff provision—the recognition of the desirability of multiethnic representation on the teaching

faculty—advanced the public interest in educating children for the future and was, thus, a valid public purpose. *Id*. at 313-316, 106 S.Ct. at 1867-1869, 90 L.Ed.2d at 293-296. Justice Stevens observed that the goal of the school board's race-conscious layoff-protection policy was to *include* minorities (not to *exclude* them) in the educational process—a goal that "plainly distinguishes the Board's valid purpose in this case from a race-conscious decision that would reinforce assumptions of inequality." (Footnote omitted.) *Id*. at 316-317, 106 S.Ct. at 1869, 90 L.Ed.2d at 296.

{¶ 74} Justice O'Connor's concurrence in *Wygant* is significant in several respects. Justice O'Connor observed that the proper analysis for racial classifications that work to the disadvantage of nonminorities had been articulated in a number of different ways by the individual Justices, in *Wygant* and elsewhere, with no particular test or formulation being adopted by a majority of the court. *Id*., 476 U.S. at 284-286, 106 S.Ct. at 1852-1853, 90 L.Ed.2d at 275-276. For her part, Justice O'Connor stated that she agreed that the strict scrutiny standard articulated by the *Wygant* plurality was the appropriate standard to apply. *Id*. However, she also observed that the court had reached a fair measure of consensus in *Wygant* on the following issue:

"The Court is in agreement that, whatever the formulation employed, *remedying past or present racial discrimination by a state actor is a sufficiently weighty state interest to warrant the remedial use of a carefully constructed affirmative action program*. This remedial purpose *need not be accompanied by contemporaneous findings of actual discrimination* to be accepted as legitimate as long as the public actor has a *firm basis for believing* that remedial action is required." (Emphasis added.) *Id*. at 286, 106 S.Ct. at 1853, 90 L.Ed.2d at 276.

{¶ 75} In her concurrence in *Wygant*, Justice O'Connor also provided much-needed insight into a variety of matters that, quite frankly, are less than

abundantly clear from a reading of the lead opinion in that case. Justice O'Connor stated:

"Respondent School Board argues that the governmental purpose or goal advanced here was the School Board's desire to correct apparent prior employment discrimination against minorities while avoiding further litigation. * * * The Michigan Civil Rights Commission determined that the evidence before it supported the allegations of discrimination on the part of the Jackson School Board, though that determination was never reduced to formal findings because the School Board, with the agreement of the Jackson Education Association (Union), voluntarily chose to remedy the perceived violation. Among the measures the School Board and the Union eventually agreed were necessary to remedy the apparent prior discrimination was the layoff provision challenged here; they reasoned that without the layoff provision, the remedial gains made under the ongoing hiring goals contained in the collective bargaining agreement could be eviscerated by layoffs.

"The District Court and the Court of Appeals did not focus on the School Board's unquestionably compelling interest in remedying its apparent prior discrimination when evaluating the constitutionality of the challenged layoff provision. Instead, both courts reasoned that the goals of remedying 'societal discrimination' and providing 'role models' were sufficiently important to withstand equal protection scrutiny. I agree with the plurality that a governmental agency's interest in remedying 'societal' discrimination, that is, discrimination not traceable to its own actions, cannot be deemed sufficiently compelling to pass constitutional muster under strict scrutiny. * * * I also concur in the plurality's assessment that use by the courts below of a 'role model' theory to justify the conclusion that this plan had a legitimate remedial purpose was in error. * * * Thus, in my view, the District Court and the Court of Appeals clearly erred in relying on

these purposes and in failing to give greater attention to the School Board's asserted purpose of rectifying its own apparent discrimination.

"The error of the District Court and the Court of Appeals can be explained by reference to the fact that the primary issue argued by the parties on the cross motions for summary judgment was whether the School Board, a court, or another competent body had to have made a finding of past discrimination before or at the time of the institution of the plan in order for the plan to be upheld as remedial in purpose. * * * The courts below ruled that a particularized, contemporaneous finding of discrimination was not necessary and upheld the plan as a remedy for 'societal' discrimination, apparently on the assumption that in the absence of a specific, contemporaneous finding, any discrimination addressed by an affirmative action plan could only be termed 'societal.' * * * I believe that this assumption is false and therefore *agree with the plurality that a contemporaneous or antecedent finding of past discrimination by a court or other competent body is not a constitutional prerequisite to a public employer's voluntary agreement to an affirmative action plan.* * * *

"A violation of federal statutory or constitutional requirements does not arise with the making of a finding; it arises when the wrong is committed. * * *

"The imposition of a requirement that public employers make findings that they have engaged in illegal discrimination before they engage in affirmative action programs would severely undermine public employers' incentive to meet voluntarily their civil rights obligations. * * *

"Such results cannot, in my view, be justified by reference to the incremental value a contemporaneous findings requirement would have as an evidentiary safeguard. As is illustrated by this case, public employers are trapped between the competing hazards of liability to minorities if affirmative action is not taken to remedy apparent employment discrimination and liability to nonminorities if affirmative action is taken. Where these employers, who are presumably fully

aware both of their duty under federal law to respect the rights of all their employees and of their potential liability for failing to do so, act on the basis of information which gives them a sufficient basis for concluding that remedial action is necessary, a contemporaneous findings requirement should not be necessary.

"This conclusion is consistent with our previous decisions recognizing the States' ability to take voluntary race-conscious action to achieve compliance with the law even in the absence of a specific finding of past discrimination. * * * Indeed, our recognition of the responsible state actor's competency to take these steps is assumed in our recognition of the States' constitutional duty to take affirmative steps to eliminate the continuing effects of past unconstitutional discrimination. * * *

"Of course, as Justice Powell notes, the public employer must discharge this sensitive duty with great care; in order to provide some measure of protection to the interests of its nonminority employees and the employer itself in the event that its affirmative action plan is challenged, the public employer must have a firm basis for determining that affirmative action is warranted. Public employers are not without reliable benchmarks in making this determination. For example, demonstrable evidence of a disparity between the percentage of qualified blacks on a school's teaching staff and the percentage of qualified minorities in the relevant labor pool sufficient to support a prima facie Title VII pattern or practice claim by minority teachers would lend a compelling basis for a competent authority such as the School Board to conclude that implementation of a voluntary affirmative action plan is appropriate to remedy apparent prior employment discrimination.

"* * * If a voluntary affirmative action plan is subsequently challenged in court by nonminority employees, those employees must be given the opportunity to prove that the plan does not meet the constitutional standard this Court has articulated. However, as the plurality suggests, the institution of such a challenge does not automatically impose upon the public employer the burden of convincing

the court of its liability for prior unlawful discrimination; nor does it mean that the court must make an actual finding of prior discrimination based on the employer's proof before the employer's affirmative action plan will be upheld. * * * In 'reverse discrimination' suits, as in any other suit, it is the plaintiffs who must bear the burden of demonstrating that their rights have been violated. The findings a court must make before upholding an affirmative action plan reflect this allocation of proof and the nature of the challenge asserted. For instance, in the example posed above, the nonminority teachers could easily demonstrate that the purpose and effect of the plan is to impose a race-based classification. *But when the Board introduces its statistical proof as evidence of its remedial purpose, thereby supplying the court with the means for determining that the Board had a firm basis for concluding that remedial action was appropriate, it is incumbent upon the nonminority teachers to prove their case; they continue to bear the ultimate burden of persuading the court that the Board's evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan instituted on the basis of this evidence was not sufficiently 'narrowly tailored.' Only by meeting this burden could the plaintiffs establish a violation of their constitutional rights, and thereby defeat the presumption that the Board's assertedly remedial action based on the statistical evidence was justified.*

"* * *

"There is, however, no need to inquire whether the provision actually had a legitimate remedial purpose based on the record, such as it is, because the judgment is vulnerable on yet another ground: the courts below applied a 'reasonableness' test in evaluating the relationship between the ends pursued and the means employed to achieve them that is plainly incorrect under any of the standards articulated by this Court. Nor is it necessary, in my view, to resolve the troubling questions whether any layoff provision could survive strict scrutiny or whether this particular layoff provision could, when considered without reference to the hiring

goal it was intended to further, pass the onerous 'narrowly tailored' requirement. Petitioners have met their burden of establishing that this layoff provision is not 'narrowly tailored' to achieve its asserted remedial purpose by demonstrating that the provision is keyed to a hiring goal that itself has no relation to the remedying of employment discrimination.

"* * * The disparity between the percentage of minorities on the teaching staff and the percentage of minorities in the student body is not probative of employment discrimination; *it is only when it is established that the availability of minorities in the relevant labor pool substantially exceeded those hired that one may draw an inference of deliberate discrimination in employment.* * * * Because the layoff provision here acts to maintain levels of minority hiring that have no relation to remedying employment discrimination, it cannot be adjudged 'narrowly tailored' to effectuate its asserted remedial purpose." (Emphasis added in part and deleted in part; footnote omitted.) *Wygant*, 476 U.S. at 287-294, 106 S.Ct. at 1854-1857, 90 L.Ed.2d at 277-282.

{¶ 76} In any event, the lack of a majority opinion in *Bakke*, *Fullilove*, and *Wygant* left unresolved the question as to the appropriate standard of review in cases involving remedial race-based governmental action. However, the court's 1989 decision in *Croson*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854, finally resolved the question concerning the appropriate standard of review for race-conscious affirmative-action programs adopted by state and local governmental actors or entities.

{¶ 77} In *Croson*, the City Council of Richmond, Virginia, had adopted a Minority Business Utilization Plan in 1983. The plan required prime contractors who had been awarded city construction contracts to subcontract at least thirty percent of the dollar amount of the contract to MBEs. The plan defined an MBE as any business owned and controlled by minority group members. Minority group members were defined by the plan as citizens of the United States who are "Blacks,

Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts." *Id*. at 478, 109 S.Ct. at 713, 102 L.Ed.2d at 871. There was no geographical limitation to the plan. Any business from anywhere in the United States that met the definition of an MBE could take advantage of the set-aside program. Prime contractors could obtain a waiver of the thirty-percent set-aside requirement, but to do so the contractor was required to prove that there were no qualified MBEs available and willing to participate.

{¶ 78} The plan in *Croson* declared that it was remedial in nature and was meant to promote wider participation by MBEs in the construction of public projects. The plan was adopted by city council following a public hearing. At the hearing, no direct evidence was presented that the city had ever engaged in racial discrimination in its construction contracting or that the city's prime contractors had ever discriminated against minority subcontractors. The evidence at the hearing included a study indicating that, although the population of Richmond was fifty-percent black, a mere .67 percent of the city's prime construction contracts had been awarded to MBEs between 1978 and 1983. It was also established that a variety of contractors' associations had virtually no MBE members. Additionally, legal counsel for the city had indicated that the plan was constitutional under *Fullilove*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902. City council members (the majority of whom were African-American) were also aware of Congress's findings in connection with the set-aside program upheld in *Fullilove* that there had been national discrimination in the construction industry. One council member stated at the hearing that racial discrimination was widespread in the construction industry in the Richmond area, in the state, and in the nation. At the hearing, opponents of the plan questioned whether there were enough MBEs in the Richmond area to satisfy the thirty-percent set-aside requirement. Additionally, representatives of local contractors' organizations indicated that they had not discriminated against minorities and, in fact, that they had been actively recruiting

minority membership. At the hearing, concerns were also raised that the plan could result in job losses in the Richmond area due to the absence of any geographic limit to the plan. On the basis of the evidence adduced at the hearing, city council enacted the ordinance by a vote of six to two.

{¶ 79} In 1983, following passage of the Richmond set-aside ordinance, the city solicited bids on a construction project for the installation of plumbing fixtures at the city jail. J.A. Croson Company ("Croson") was the sole bidder. Croson applied for and was denied a waiver of the set-aside requirement, and, consequently, Croson eventually lost its contract with the city. Thereafter, Croson sued in federal district court, alleging that the city ordinance was unconstitutional, on its face and as applied, under the Equal Protection Clause of the Fourteenth Amendment. The district court upheld Richmond's set-aside plan in all respects.

{¶ 80} On appeal, the United States Fourth Circuit Court of Appeals, applying a test derived from *Fullilove*, affirmed the judgment of the district court. The court of appeals found that the great deference the *Fullilove* court had accorded to Congress's findings of past national discrimination in the construction industry also applied to the determination whether the Richmond City Council had acted reasonably in adopting the Richmond set-aside plan. Specifically, the appellate court found that the national findings of discrimination, coupled with the statistical study showing the lack of significant minority participation in public contracting in Richmond, provided a reasonable basis for the city's conclusion that the low minority participation in city contracts was due to past discrimination. The court of appeals also determined that the plan was narrowly tailored. However, on petition for certiorari, the United States Supreme Court vacated the judgment of the court of appeals and remanded the cause for further consideration in light of its intervening decision in *Wygant*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260. On remand, the court of appeals in *Croson* struck down Richmond's minority set-aside program, finding that the program failed both prongs of the strict scrutiny test. In

particular, the court of appeals determined that the set-aside plan was not justified by a compelling interest, since there was no evidence of past discrimination *by the city itself* in letting public contracts and that the city could not rely simply on " 'broad-brush assumptions of historical discrimination.' " *Croson*, 488 U.S. at 485, 109 S.Ct. at 717, 102 L.Ed.2d at 876, quoting 822 F.2d 1355, 1357. The court of appeals also determined that the thirty-percent set-aside requirement in the Richmond program was not narrowly tailored to achieve a remedial objective. On appeal from the court of appeals' decision on remand, the United States Supreme Court affirmed the judgment of the court of appeals.

**{¶ 81}** In *Croson*, Justice O'Connor authored the lead opinion, speaking for a plurality of the court on some issues and for a majority on others. The majority in *Croson* held that "the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification," *id.*, 488 U.S. at 494, 109 S.Ct. at 722, 102 L.Ed.2d at 882, and that the standard of review for all racial classifications is strict scrutiny, *id*. at 493-494, 109 S.Ct. at 721-722, 102 L.Ed.2d at 881-882 (plurality opinion of O'Connor, J., joined by Rehnquist, C.J., and White and Kennedy, JJ.). See, also, *id*. at 520, 109 S.Ct. at 735-736, 102 L.Ed.2d at 899 (Scalia, J., concurring in judgment) ("I agree with much of the Court's opinion, and, in particular, with Justice O'Connor's conclusion that strict scrutiny must be applied to all governmental classification by race, whether or not its asserted purpose is 'remedial' or 'benign' "). *Croson*, therefore, definitively established the bedrock principle that the Fourteenth Amendment requires strict scrutiny of all racial classifications imposed by state or local government entities or actors. See, also, *Adarand*, 515 U.S. at 222, 115 S.Ct. at 2110, 132 L.Ed.2d at 178-179 ("With *Croson*, the Court finally agreed that the Fourteenth Amendment requires strict scrutiny of all race-based action by state and local governments").

{¶ 82} The breakdown of the votes in *Croson* makes that case tremendously difficult to discuss and even more difficult to understand. The lead opinion in *Croson* is actually a mixture of plurality and majority views. Thus, in order to derive full meaning from the *Croson* decision, a section-by-section analysis of the case becomes necessary.

{¶ 83} A plurality in *Croson* (Part II of opinion of O'Connor, J., joined by Rehnquist, C.J., and White, J.) began the discussion by addressing an "initial battle" of the parties "over the scope of the city's power to adopt legislation designed to address the effects of past discrimination." *Id*., 488 U.S. at 486, 109 S.Ct. at 718, 102 L.Ed.2d at 877. Specifically, appellee Croson, relying on *Wygant*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260, had argued that the city of Richmond was required to limit any race-based remedial efforts to eradicating the effects of the city's *own* prior discrimination. *Croson* at 486, 109 S.Ct. at 718, 102 L.Ed.2d at 877. Conversely, the city had argued that *Fullilove*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902, was controlling, and that the city therefore enjoyed the same type of sweeping legislative power to define and attack the effects of prior discrimination in its local construction industry that Congress had enjoyed on a national level in *Fullilove*. *Croson* at 486, 109 S.Ct. at 718, 102 L.Ed.2d at 877. The plurality in *Croson* concluded, "[N]either of these two rather stark alternatives can withstand analysis," *id*., and went on to address the arguments in detail, stating:

"Appellant [the city] and its supporting *amici* rely heavily on *Fullilove* for the proposition that a city council, like Congress, need not make specific findings of discrimination to engage in race-conscious relief. * * *

"What appellant ignores is that Congress, unlike any State or political subdivision, has a specific constitutional mandate [in Section 5 of the Fourteenth Amendment] to enforce the dictates of the Fourteenth Amendment. * * *

"That Congress may identify and redress the effects of society-wide discrimination does not mean that, *a fortiori*, the States and their political

subdivisions are free to decide that such remedies are appropriate. Section 1 of the Fourteenth Amendment [containing the Equal Protection Clause] is an explicit *constraint* on state power, and the States must undertake any remedial efforts in accordance with that provision. To hold otherwise would be to cede control over the content of the Equal Protection Clause to the 50 state legislatures and their myriad political subdivisions. The mere recitation of a benign or compensatory purpose for the use of a racial classification would essentially entitle the States to exercise the full power of Congress under §5 of the Fourteenth Amendment and insulate any racial classification from judicial scrutiny under §1. We believe that such a result would be contrary to the intentions of the Framers of the Fourteenth Amendment, who desired to place clear limits on the States' use of race as a criterion for legislative action, and to have the federal courts enforce those limitations. * * *

"* * * Thus, our treatment of an exercise of congressional power in *Fullilove* cannot be dispositive here. * * *

"It would seem equally clear, however, that a state or local subdivision (if delegated the authority from the State) has the authority to eradicate the effects of private discrimination within its own legislative jurisdiction. This authority must, of course, be exercised within the constraints of §1 of the Fourteenth Amendment. Our decision in *Wygant* is not to the contrary. *Wygant* addressed the constitutionality of the use of racial quotas by local school authorities pursuant to an agreement reached with the local teachers' union. It was in the context of addressing the school board's power to adopt a race-based layoff program affecting its own work force that the *Wygant* plurality indicated that the Equal Protection Clause required 'some showing of prior discrimination by the governmental unit involved.' *Wygant*, 476 U.S., at 274 [106 S.Ct. at 1847, 90 L.Ed.2d at 269]. As a matter of state law, the city of Richmond has legislative authority over its procurement policies, and can use its spending powers to remedy private

discrimination, if it identifies that discrimination with the particularity required by the Fourteenth Amendment. To this extent, on the question of the city's competence, the Court of Appeals erred in following *Wygant* by rote in a case involving a state entity which has state-law authority to address discriminatory practices within local commerce under its jurisdiction.

"Thus, if the city could show that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of the local construction industry, we think it clear that the city could take affirmative steps to dismantle such a system. It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." (Emphasis *sic* and footnote omitted.) *Croson*, 488 U.S. at 489-492, 109 S.Ct. at 719-721, 102 L.Ed.2d at 879-881 (Part II of opinion of O'Connor, J., joined by Rehnquist, C.J., and White, J.).

{¶ 84} Next, a plurality in *Croson* (Part III-A of opinion of O'Connor, J., joined by Rehnquist, C.J., White and Kennedy, JJ.) stated that the rights secured by the Equal Protection Clause are *personal* rights, and that the Richmond program "denies certain citizens the opportunity to compete for a fixed percentage of public contracts based solely upon their race." *Id.*, 488 U.S. at 493, 109 S.Ct. at 721, 102 L.Ed.2d at 881. Therefore, the plurality observed, "[t]o whatever racial group these citizens belong, their 'personal rights' to be treated with equal dignity and respect are implicated by a rigid rule erecting race as the sole criterion in an aspect of public decisionmaking." *Id.* The plurality stated, "Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Id.* The plurality also observed, "Indeed, the purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the legislative body is

pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Id*. at 493, 109 S.Ct. at 721, 102 L.Ed.2d at 881-882. Additionally, the plurality in *Croson*, expressing a concern that racial classifications "carry a danger of stigmatic harm," determined that unless racial classifications "are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility." *Id*. at 493, 109 S.Ct. at 722, 102 L.Ed.2d at 882. Accordingly, the plurality in *Croson* "reaffirm[ed] the view expressed by the plurality in *Wygant* that the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification." *Croson*, 488 U.S. at 494, 109 S.Ct. at 722, 102 L.Ed.2d at 882. Further, pledging "continued adherence to the standard of review employed in *Wygant*," the plurality in *Croson* retained the strict scrutiny standard of review. *Id*. That determination, coupled with Justice Scalia's concurring view that strict scrutiny applies "to all governmental classification by race, whether or not its asserted purpose is 'remedial' or 'benign,' " *id*. at 520, 109 S.Ct. at 735-736, 102 L.Ed.2d at 899, constituted a majority in support of the strict scrutiny standard.

{¶ 85} The plurality in *Croson* (Part III-A of opinion of O'Connor, J., joined by Rehnquist, C.J., White and Kennedy, JJ.) also went on to discuss the rationale of the plurality opinion in *Wygant*. Specifically, the plurality in *Croson*, 488 U.S. at 497-498, 109 S.Ct. at 723-724, 102 L.Ed.2d at 884, stated:

"In *Wygant* [476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260], four Members of the Court applied heightened scrutiny to a race-based system of employee layoffs. Justice Powell, writing for the plurality, again drew the distinction between 'societal discrimination' which is an inadequate basis for race-conscious classifications, and the type of identified discrimination that can support and define

the scope of race-based relief. The challenged classification in that case tied the layoff of minority teachers to the percentage of minority students enrolled in the school district. The lower courts had upheld the scheme, based on the theory that minority students were in need of 'role models' to alleviate the effects of prior discrimination in society. This Court reversed, with a plurality of four Justices reiterating the view expressed by Justice Powell in *Bakke* [438 U.S. at 307, 98 S.Ct. at 2757, 57 L.Ed.2d at 782, that remedying the effects of historic societal discrimination is too amorphous a basis to justify imposing a racially classified remedy].

"The role model theory employed by the lower courts [in *Wygant*] failed for two reasons. First, the statistical disparity between students and teachers had no probative value in demonstrating the kind of prior discrimination in hiring or promotion that would justify race-based relief. 476 U.S., at 276 [106 S.Ct. at 1848, 90 L.Ed.2d at 270]; see also *id*., at 294 [106 S.Ct. at 1857, 90 L.Ed.2d at 281] (O'Connor, J., concurring in part and concurring in judgment) ('The disparity between the percentage of minorities on the teaching staff and the percentage of minorities in the student body is not probative of employment discrimination'). Second, because the role model theory had no relation to some basis for believing a constitutional or statutory violation had occurred, it could be used to 'justify' race-based decisionmaking essentially limitless in scope and duration. *Id*. [*Wygant*], at 276 [106 S.Ct. at 1848, 90 L.Ed.2d at 270] (plurality opinion) ('In the absence of particularized findings, a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future')."

{¶ 86} Immediately following the *Croson* plurality's discussion of *Wygant*, the opinion in *Croson* abruptly changes to a majority opinion. Specifically, in Part III-B of *Croson*, Justice O'Connor, now speaking for a majority of the court, stated:

"We think it clear that the factual predicate offered in support of the Richmond Plan suffers from the same two defects identified as fatal in *Wygant*.

The District Court found the city council's 'findings sufficient to ensure that, in adopting the Plan, it was remedying the present effects of past discrimination in the *construction industry*. * * * Like the 'role model' theory employed in *Wygant*, a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy. It 'has no logical stopping point.' *Wygant*, *supra*, at 275 [106 S.Ct. at 1847, 90 L.Ed.2d at 269] (plurality opinion). 'Relief' for such an ill-defined wrong could extend until the percentage of public contracts awarded to MBE's in Richmond mirrored the percentage of minorities in the population as a whole.

"Appellant argues that it is attempting to remedy various forms of past discrimination that are alleged to be responsible for the small number of minority businesses in the local contracting industry. Among these the city cites [the historic exclusion of blacks from skilled construction trade unions and training programs and a host of nonracial factors that would seemingly affect a member of any racial group seeking to establish a new business enterprise].

"While there is no doubt that the sorry history of both private and public discrimination in this country has contributed to a lack of opportunities for black entrepreneurs, this observation, standing alone, cannot justify a rigid racial quota in the awarding of public contracts in Richmond, Virginia. Like the claim [in *Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750] that discrimination in primary and secondary schooling justifies a rigid racial preference in medical school admissions, an amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota.

"It is sheer speculation how many minority firms there would be in Richmond absent past societal discrimination, just as it was sheer speculation how many minority medical students would have been admitted to the medical school at Davis [in *Bakke*] absent past discrimination in educational opportunities.

Defining these sorts of injuries as 'identified discrimination' would give local governments license to create a patchwork of racial preferences based on statistical generalizations about any particular field of endeavor.

"These defects are readily apparent in this case. The 30% quota cannot in any realistic sense be tied to any injury suffered by anyone. The District Court relied upon five predicate 'facts' in reaching its conclusion that there was an adequate basis for the 30% quota: (1) the ordinance declares itself to be remedial; (2) several proponents of the measure stated their views that there had been past discrimination in the construction industry; (3) minority businesses received 0.67% of prime contracts from the city while minorities constituted 50% of the city's population; (4) there were very few minority contractors in local and state contractors' associations; and (5) in 1977, Congress made a determination that the effects of past discrimination had stifled minority participation in the construction industry nationally. * * *

"None of these 'findings,' singly or together, provide the city of Richmond with a 'strong basis in evidence for its conclusion that remedial action was necessary.' *Wygant*, 476 U.S., at 277 [106 S.Ct. at 1849, 90 L.Ed.2d at 271] (plurality opinion). There is nothing approaching a prima facie case of a constitutional or statutory violation by *anyone* in the Richmond construction industry. *Id*., at 274-275 [106 S.Ct. at 1847, 90 L.Ed.2d at 268-269]; see also *id*., at 293 [106 S.Ct. at 1857, 90 L.Ed.2d at 280-281] (O'Connor, J., concurring)." (Emphasis *sic*.) *Croson*, 488 U.S. at 498-500, 109 S.Ct. at 724-725, 102 L.Ed.2d at 884-886 (Part III-B of opinion of O'Connor, J., joined by Rehnquist, C.J., White, Stevens and Kennedy, JJ.).

{¶ 87} Additionally, in Part III-B of the opinion in *Croson*, Justice O'Connor, speaking for the majority of the court, addressed and rejected each of the five separate predicate facts the district court had relied upon in upholding the city of Richmond's set-aside program. *Id*. at 499-504, 109 S.Ct. at 725-727, 102

L.Ed.2d at 885-889. The court's assessment of each of the five predicate facts is set forth immediately below.

{¶ 88} First, the *Croson* majority determined that the district court had erred in according great weight to the fact that city council had declared the Richmond set-aside program to be remedial in nature. *Id*., 488 U.S. at 500, 109 S.Ct. at 725, 102 L.Ed.2d at 886. Specifically, the *Croson* majority found that "the mere recitation of a 'benign' or legitimate purpose for a racial classification is entitled to little or no weight." *Id*. The court reasoned that because racial classifications are inherently suspect, "simple legislative assurances of good intention cannot suffice." *Id*.

{¶ 89} Second, the court in *Croson* found that the district court had relied on a "highly conclusionary" statement by a member of the Richmond City Council that there was discrimination in the construction industry in Richmond, in Virginia, and in the nation. *Id*., 488 U.S. at 500, 109 S.Ct. at 725, 102 L.Ed.2d at 886. The court in *Croson* also found that the district court had relied on a statement by the Richmond city manager that discrimination was prevalent in the city manager's hometown in Pennsylvania. *Id*. The *Croson* majority determined that these statements were of "little probative value in establishing identified discrimination in the Richmond construction industry." *Id*. The *Croson* majority held that although the factfinding process of a legislative body is generally entitled to a presumption of regularity and deferential review by the judiciary, "when a legislative body chooses to employ a suspect classification, it cannot rest on a generalized assertion as to the classification's relevance to its goals. * * * A governmental actor cannot render race a legitimate proxy for a particular condition merely by declaring that the condition exists. * * * The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis." *Id*. at 500-501, 109 S.Ct. at 725, 102 L.Ed.2d at 886.

**{¶ 90}** Third, the *Croson* majority determined that the district court's reliance on the statistical disparity between the number of prime contracts awarded to minority enterprises and the minority population of the city of Richmond was similarly misplaced. *Id*., 488 U.S. at 501, 109 S.Ct. at 725, 102 L.Ed.2d at 886. The court in *Croson* noted that gross disparities alone may constitute prima facie proof of a pattern of discrimination, but that when special qualifications are necessary to perform particular tasks, the relevant statistical pool must consist of the group of individuals that are qualified to perform the task. *Id*. at 501-502, 109 S.Ct. at 725-726, 102 L.Ed.2d at 887. In this regard, the *Croson* majority observed:

"In this case, the city does not even know how many MBE's in the relevant market are qualified to undertake prime or subcontracting work in public construction projects. Cf. *Ohio Contractors Assn. v. Keip* [C.A.6, 1983], 713 F.2d [167], at 171 (relying on percentage of minority *businesses* in the State compared to percentage of state purchasing contracts awarded to minority firms in upholding set-aside). Nor does the city know what percentage of total city construction dollars minority firms now receive as subcontractors on prime contracts let by the city.

"To a large extent, the set-aside of subcontracting dollars seems to rest on the unsupported assumption that white prime contractors simply will not hire minority firms. * * * Indeed, there is evidence in this record that overall minority participation in city contracts in Richmond is 7 to 8%, and that minority contractor participation in the Community Block Development Grant *construction* projects is 17 to 22%. * * * Without any information on minority participation in subcontracting, it is quite simply impossible to evaluate overall minority representation in the city's construction expenditures." (Emphasis *sic* and footnote omitted.) *Croson*, 488 U.S. at 502-503, 109 S.Ct. at 726, 102 L.Ed.2d at 887-888.

**{¶ 91}** Fourth, the court in *Croson* rejected the city's and the district court's reliance on evidence that MBE membership in local subcontractor associations was low, finding that "standing alone this evidence is not probative of any

66

discrimination in the local construction industry." *Id*. at 503, 109 S.Ct. at 726, 102 L.Ed.2d at 888. The court observed that there could be many reasons for the phenomenon, including things such as "past societal discrimination in education and economic opportunities as well as both black and white career and entrepreneurial choices." *Id*. at 503, 109 S.Ct. at 726-727, 102 L.Ed.2d at 888. The court also found that "[t]he mere fact that black membership in these trade organizations is low, standing alone, cannot establish a prima facie case of discrimination." *Id*. at 503, 109 S.Ct. at 727, 102 L.Ed.2d at 888. Additionally, the *Croson* majority stated:

"For low minority membership in these associations to be relevant, the city would have to link it to the number of local MBE's eligible for membership. If the statistical disparity between eligible MBE's and MBE membership were great enough, an inference of discriminatory exclusion could arise. In such a case, the city would have a compelling interest in preventing its tax dollars from assisting these organizations in maintaining a racially segregated construction market. See * * * [*Keip*], *supra*, [713 F.2d] at 171 (upholding minority set-aside based in part on earlier District Court finding that 'the state [of Ohio] had become "a joint participant" with private industry and certain craft unions in a pattern of racially discriminatory conduct which excluded black laborers from work on public construction contracts')." *Croson*, 488 U.S. at 503-504, 109 S.Ct. at 727, 102 L.Ed.2d at 888.

{¶ 92} Fifth, the court in *Croson* found that the city's and the district court's reliance on Congress's findings that there had been nationwide discrimination in the construction industry in the context of the set-aside program approved in *Fullilove* was of extremely limited value in demonstrating the existence of discrimination in Richmond. *Croson* at 504, 109 S.Ct. at 727, 102 L.Ed.2d at 888. The *Croson* majority stated, "While the States and their subdivisions may take remedial action when they possess evidence that their own spending practices are

exacerbating a pattern of prior discrimination, they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief. Congress has made national findings that there has been societal discrimination in a host of fields. If all a state or local government need do is find a congressional report on the subject to enact a set-aside program, the constraints of the Equal Protection Clause will, in effect, have been rendered a nullity." *Id*. at 504, 109 S.Ct. at 727, 102 L.Ed.2d at 889.

**{¶ 93}** Accordingly, the majority in *Croson* concluded that the city had simply failed to make a showing of any *identified* discrimination in the Richmond construction industry and, thus, had failed to demonstrate any compelling interest for the race-based set-aside program. *Id*., 488 U.S. at 505, 109 S.Ct. at 728, 102 L.Ed.2d at 889. The majority also noted that its analysis had applied only to the inclusion of blacks within the Richmond set-aside plan, that there was no evidence whatsoever of any past discrimination involving other racial groups that had been included in the program such as Aleuts and Eskimos, and that "[i]t may well be that Richmond has never had an Aleut or Eskimo citizen." *Id*. at 506, 109 S.Ct. at 728, 102 L.Ed.2d at 890. The court observed that this seemingly "random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination in the construction industry in Richmond suggests that perhaps the city's purpose was not in fact to remedy past discrimination." *Id*. Moreover, adding to the undifferentiated nature of the Richmond set-aside program was the lack of any geographic limit to the plan, so that an Eskimo-owned MBE from Alaska, for instance, could participate in the program even though that enterprise never suffered any discrimination in the Richmond construction industry. Thus, as the court in *Croson* noted, "[t]he gross overinclusiveness of Richmond's racial preference strongly impugns the city's claim of remedial motivation." *Id*.

**{¶ 94}** A majority of the court in *Croson* also determined that the Richmond plan was not or simply could not be narrowly tailored. Specifically, in Part IV of

the opinion, Justice O'Connor, once again speaking for the majority, stated that "it is almost impossible to assess whether the Richmond Plan is narrowly tailored to remedy prior discrimination since it is not linked to identified discrimination in any way." *Id.*, 488 U.S. at 507, 109 S.Ct. at 729, 102 L.Ed.2d at 890. Nevertheless, on the issue of narrow tailoring, the court made two observations. First, the court observed that the city of Richmond had apparently never considered any race-neutral alternatives to the race-based quota. *Id.* In this regard, the court noted that, in *Fullilove*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902, the court had found that Congress had carefully considered and rejected the use of alternatives to a race-based remedy and had known from past experience that such alternatives would have failed to ameliorate the effects of discrimination in the construction industry. *Croson*, 488 U.S. at 507, 109 S.Ct. at 729, 102 L.Ed.2d at 891. Second, the court observed that Richmond's thirty-percent set-aside quota could not be narrowly tailored to any goal except "outright racial balancing," since the quota had been predicated on the " 'completely unrealistic' assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." *Id.* In addition, the court in *Croson* stated:

"Since the city must already consider bids and waivers on a case-by-case basis, it is difficult to see the need for a rigid numerical quota. As noted above, the congressional scheme upheld in *Fullilove* allowed for a waiver of the set-aside provision where an MBE's higher price was not attributable to the effects of past discrimination. Based upon proper findings, such programs are less problematic from an equal protection standpoint because they treat all candidates individually, rather than making the color of an applicant's skin the sole relevant consideration. Unlike the program upheld in *Fullilove*, the Richmond Plan's waiver system focuses solely on the availability of MBE's; there is no inquiry into whether or not the particular MBE seeking a racial preference has suffered from the effects of past discrimination by the city or prime contractors.

"Given the existence of an individualized procedure, the city's only interest in maintaining a quota system rather than investigating the need for remedial action in particular cases would seem to be simple administrative convenience. But the interest in avoiding the bureaucratic effort necessary to tailor remedial relief to those who truly have suffered the effects of prior discrimination cannot justify a rigid line drawn on the basis of a suspect classification. * * * Under Richmond's scheme, a successful black, Hispanic, or Oriental entrepreneur from anywhere in the country enjoys an absolute preference over other citizens based solely on their race. We think it obvious that such a program is not narrowly tailored to remedy the effects of prior discrimination." *Croson*, 488 U.S. at 508, 109 S.Ct. at 729-730, 102 L.Ed.2d at 891.

{¶ 95} Finally, in Part V of *Croson*, the opinion reverts to a plurality opinion. Therein, the plurality (O'Connor, J., joined by Rehnquist, C.J., White and Kennedy, JJ.) specifically stated, in no uncertain terms:

"Nothing we say today precludes a state or local entity from taking action to rectify the effects of identified discrimination within its jurisdiction. If the city of Richmond had evidence before it that nonminority contractors were systematically excluding minority businesses from subcontracting opportunities, it could take action to end the discriminatory exclusion. Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise. * * * Under such circumstances, the city could act to dismantle the closed business system by taking appropriate measures against those who discriminate on the basis of race or other illegitimate criteria. * * * In the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion." *Id*. at 509, 109 S.Ct. at 730, 102 L.Ed.2d at 892.

**{¶ 96}** The plurality in *Croson* noted, however, that Richmond had ascertained neither "how many minority enterprises are present in the local construction market nor the level of their participation in city construction projects," and that "[t]he city points to no evidence that qualified minority contractors have been passed over for city contracts or subcontracts, either as a group or in any individual case." *Id*., 488 U.S. at 510, 109 S.Ct. at 730, 102 L.Ed.2d at 892-893. Therefore, the plurality stated, "Under such circumstances, it is simply impossible to say that the city has demonstrated 'a strong basis in evidence for its conclusion that remedial action was necessary.' " *Id*. at 510, 109 S.Ct. at 730, 102 L.Ed.2d at 893, quoting *Wygant*, 476 U.S. at 277, 106 S.Ct. at 1849, 90 L.Ed.2d at 271. The plurality in *Croson* added that "[p]roper findings in this regard are necessary to define both the scope of the injury and the extent of the remedy necessary to cure its effects," and that "[s]uch findings also serve to assure all citizens that the deviation from the norm of equal treatment * * * is a temporary matter * * * [undertaken to promote the goal] of equality itself." *Id.*, 488 U.S. at 510, 109 S.Ct. at 730-731, 102 L.Ed.2d at 893.

**{¶ 97}** Justice Stevens wrote a separate opinion, in which he took issue with what he saw as the underlying premise of both *Wygant* and *Croson* — that governmental decisions based on racial classifications are never permissible except to remedy past wrongs. *Croson*, 488 U.S. at 511, 109 S.Ct. at 731, 102 L.Ed.2d at 893 (Stevens, J., concurring in part and concurring in judgment). However, Justice Stevens did agree with the court's explanation as to why the Richmond program could not be justified as a remedy for past discrimination and, thus, joined Parts III-B and IV of the *Croson* opinion. *Id*. at 511-512, 109 S.Ct. at 731, 102 L.Ed.2d at 893-894.

**{¶ 98}** Justice Kennedy also wrote separately in *Croson*, 488 U.S. at 518-520, 109 S.Ct. at 734-735, 102 L.Ed.2d at 897-899, concurring in part and concurring in judgment. He joined all but Part II of the *Croson* opinion and stated

71

his general agreement with the strict scrutiny standard adopted by the court. *Id*. at 518-519, 109 S.Ct. at 734-735, 102 L.Ed.2d at 897-898. In his concurrence, Justice Kennedy stated, "[I]t suffices to say that the State has the power to eradicate racial discrimination and its effects in both the public and private sectors, and the absolute duty to do so where those wrongs were caused intentionally by the State itself." *Id*. at 518, 109 S.Ct. at 735, 102 L.Ed.2d at 898. He also stated, "The ordinance before us falls short of the [strict scrutiny] standard we adopt. The nature and scope of the injury that existed; its historic or antecedent causes; the extent to which the city contributed to it, either by intentional acts or by passive complicity in acts of discrimination by the private sector; the necessity for the response adopted, its duration in relation to the wrong, and the precision with which it otherwise bore on whatever injury in fact was addressed, were all matters unmeasured, unexplored, and unexplained by the city council. We are left with an ordinance and a legislative record open to the fair charge that it is not a remedy but is itself a preference which will cause the same corrosive animosities that the Constitution forbids in the whole sphere of government and that our national policy condemns in the rest of society as well." *Id*. at 519-520, 109 S.Ct. at 735, 102 L.Ed.2d at 898-899.

{¶ 99} Justice Scalia concurred in the judgment in *Croson*, 488 U.S. at 520-528, 109 S.Ct. at 735-740, 102 L.Ed.2d at 899-904. He agreed with much of the court's analysis and, particularly, the conclusion that strict scrutiny applies to all governmental classifications by race regardless of the asserted purpose of the classification. *Id*. at 520, 109 S.Ct. at 735-736, 102 L.Ed.2d at 899. Additionally, Justice Scalia stated his view that "there is only one circumstance in which the States may act *by race* to 'undo the effects of past discrimination': where that is necessary to eliminate their own maintenance of a system of unlawful racial classification." (Emphasis *sic*.) *Id*. at 524, 109 S.Ct. at 738, 102 L.Ed.2d at 901.

{¶ 100} Three Justices dissented in *Croson*. The principal dissent was written by Justice Marshall and was joined by Justices Brennan and Blackmun. *Id*.,

488 U.S. at 528-561, 109 S.Ct. at 740-757, 102 L.Ed.2d at 904-926. Therein, the dissenters lamented the adoption of the strict scrutiny test in the context of remedial race-based action, and lambasted the majority for what they evidently perceived to be the court's narrow view of the Equal Protection Clause, its myopic view of the evidence, and its departure from precedent.

{¶ 101} *Croson* finally decided the appropriate standard of review under the Equal Protection Clause of the *Fourteenth Amendment* for race-conscious set-aside programs by *state and local governments*. However, *Croson* did not directly decide the question as to the appropriate test under the *Fifth Amendment* for benign or remedial race-based classifications imposed by the *federal government*. This latter issue was addressed by the court in 1990, but was not *finally* resolved until the court's 1995 decision in *Adarand*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158.

{¶ 102} In 1990, the United States Supreme Court, by a vote of five to four, upheld two minority preference policies that had been adopted by the Federal Communications Commission to comply with certain congressional mandates. *Metro Broadcasting, Inc. v. Fed. Communications Comm*. (1990), 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445, overruled in *Adarand*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158. In *Metro Broadcasting*, the majority stated:

"A majority of the Court in *Fullilove* [448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902] did not apply strict scrutiny to the race-based classification at issue. Three Members inquired 'whether the *objectives* of th[e] legislation are within the power of Congress' and 'whether the limited use of racial and ethnic criteria * * * is a constitutionally permissible *means* for achieving the congressional objectives.' *Id*., at 473 [100 S.Ct. at 2772, 65 L.Ed.2d at 921] (opinion of Burger, C.J.) (emphasis in original). Three other Members would have upheld benign racial classifications that 'serve important governmental objectives and are substantially related to achievement of those objectives.' *Id*., at 519 [100 S.Ct. at 2796, 65 L.Ed.2d at 951] (Marshall, J., concurring in judgment). We apply *that standard*

today. We hold that benign race-conscious measures mandated by Congress—even if those measures are not 'remedial' in the sense of being designed to compensate victims of past governmental or societal discrimination—are constitutionally permissible to the extent that they serve important governmental objectives within the power of Congress and are substantially related to achievement of those objectives." (Emphasis added and footnote omitted.) *Metro Broadcasting*, 497 U.S. at 564-565, 110 S.Ct. at 3008-3009, 111 L.Ed.2d at 462-463.

{¶ 103} Thus, the court adopted the intermediate level of scrutiny for congressionally mandated benign racial classifications. The court distinguished its holding from the decision in *Croson* (which had imposed the strict scrutiny standard for all racial classifications prescribed by state and local governments) by noting Congress's unique powers in the area of equal protection and its institutional competence to deal with societywide problems. *Metro Broadcasting* at 565-566, 110 S.Ct. at 3009, 111 L.Ed.2d at 463-464.

{¶ 104} In 1995, however, the court overruled *Metro Broadcasting* in *Adarand*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158. In *Adarand*, a federal agency awarded the prime contract for a federal highway construction project in Colorado to a prime contractor, Mountain Gravel & Construction Company, which, in turn, solicited bids from subcontractors for the guardrail portion of the contract. The terms of the prime contract provided that Mountain Gravel would receive additional compensation if it hired subcontractors certified as small businesses controlled by socially and economically disadvantaged individuals. Federal law required subcontracting compensation clauses similar to the one in Mountain Gravel's prime contract to be used in most federal agency contracts, and required the contractor to presume that "socially and economically disadvantaged individuals" included certain named minorities and any other individuals found to be disadvantaged by the Small Business Administration ("SBA"). Adarand Constructors, Inc., a Colorado-based company specializing in guardrail work,

submitted the low bid for the guardrail portion of the highway construction contract. Gonzales Construction Company also submitted a bid. Gonzales had been certified as a small disadvantaged business enterprise ("DBE"); however, Adarand had not. Thus, solely on the basis of the financial incentive clause, Mountain Gravel accepted Gonzales's bid despite the fact that Adarand was the lowest bidder. Although the record did not reveal precisely how Gonzales had obtained its certification as a DBE, Gonzales could have obtained certification under either the SBA's "8(a)" or "8(d)" program, or a program of certification by a state agency under relevant United States Department of Transportation regulations. *Id*. at 209-210, 115 S.Ct. at 2104, 132 L.Ed.2d at 170. Each of these three routes to certification used, to some extent or another, race-based presumptions. *Id*. at 206-208, 115 S.Ct. at 2102-2103, 132 L.Ed.2d at 168-169.

{¶ 105} Adarand filed suit against federal officials in district court after it lost the guardrail subcontract to Gonzales, claiming that the race-based presumptions involved in the government's use of subcontracting compensation clauses denied Adarand the right to equal protection of the laws. The district court granted summary judgment in favor of the government. The United States Tenth Circuit Court of Appeals affirmed the judgment of the district court. The court of appeals read *Fullilove*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902, as having adopted a "lenient standard," akin to "intermediate scrutiny," for assessing the constitutionality of federal race-based action. *Adarand*, 515 U.S. at 210, 115 S.Ct. at 2104, 132 L.Ed.2d at 170. The court of appeals, applying this lenient standard as it was further developed in *Metro Broadcasting*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445, upheld the government's use of subcontracting compensation clauses in federal agency contracts. *Adarand*, 515 U.S. at 210, 115 S.Ct. at 2104, 132 L.Ed.2d at 170.

{¶ 106} In *Adarand*, the United States Supreme Court vacated the judgment of the Tenth Circuit Court of Appeals and remanded the cause to the lower federal

courts for review under strict scrutiny. *Id*. at 237-239, 115 S.Ct. at 2118, 132 L.Ed.2d at 189 (opinion of O'Connor, J., joined by Rehnquist, C.J., Scalia, Kennedy and Thomas, JJ.). Justice O'Connor's opinion in *Adarand* spoke for a majority of the court, except in one particular section, and except to the extent that the opinion "might be inconsistent" with the views expressed by Justice Scalia in his concurrence. *Id*. at 204, 115 S.Ct. at 2101, 132 L.Ed.2d at 167; see, also, *id*. at 239, 115 S.Ct. at 2118-2119, 132 L.Ed.2d at 189-190 (Scalia, J., concurring in part and concurring in judgment).

{¶ 107} In *Adarand*, the United States Supreme Court thoroughly reviewed the relevant equal protection decisions predating *Metro Broadcasting*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445, and determined that the decisions through *Croson* had established "three general propositions with respect to governmental racial classifications." *Adarand*, 515 U.S. at 223, 115 S.Ct. at 2111, 132 L.Ed.2d at 179. The court identified these general propositions as follows:

"First, skepticism: ' "Any preference based on racial or ethnic criteria must necessarily receive a most searching examination," ' *Wygant*, 476 U.S., at 273 [106 S.Ct. at 1847, 90 L.Ed.2d at 268] (plurality opinion of Powell, J.); *Fullilove*, 448 U.S., at 491 [100 S.Ct. at 2781, 65 L.Ed.2d at 933] (opinion of Burger, C.J.) * * *. * * * Second, consistency: '[T]he standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification,' *Croson*, 488 U.S., at 494 [109 S.Ct. at 722, 102 L.Ed.2d at 882] (plurality opinion); *id*., at 520 [109 S.Ct. at 735-736, 102 L.Ed.2d at 899] (Scalia, J., concurring in judgment); see also *Bakke*, 438 U.S., at 289-290 [98 S.Ct. at 2747-2748, 57 L.Ed.2d at 770-771] (opinion of Powell, J.), *i.e*., all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized. And third, congruence: 'Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment' * * *. Taken together, these three propositions lead to the conclusion that any person, of whatever race, has the right

to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand*, 515 U.S. at 223-224, 115 S.Ct. at 2111, 132 L.Ed.2d at 179-180.

{¶ 108} The court in *Adarand* then took aim at *Metro Broadcasting*, finding that the adoption of intermediate scrutiny in *Metro Broadcasting* had departed from precedent in two important respects.  First, *Metro Broadcasting* had turned its back on the explanation in *Croson* as to why strict scrutiny of all governmental racial classifications is essential, to wit, to determine what classifications are truly benign or remedial as opposed to those that are motivated by illegitimate notions of racial inferiority or racial politics, to smoke out illegitimate uses of race, and to ensure that the means chosen by the governmental actor fit a compelling goal so tightly that there is little or no chance that the motive for the classification was illegitimate racial prejudice or stereotype.  *Adarand* at 226, 115 S.Ct. at 2112, 132 L.Ed.2d at 181; see, also, *Croson* at 493, 109 S.Ct. at 721, 102 L.Ed.2d at 881-882 (plurality opinion of O'Connor, J.).  Second, the *Adarand* majority concluded that *Metro Broadcasting* had "squarely rejected one of the three propositions established by the Court's earlier equal protection cases, namely, congruence between the standards applicable to federal and state racial classifications, and in so doing also undermined the other two—skepticism of all racial classifications and consistency of treatment irrespective of the race of the burdened or benefited group." *Adarand* at 226-227, 115 S.Ct. at 2112, 132 L.Ed.2d at 181.

{¶ 109} In *Adarand*, the majority determined that the principles of skepticism, consistency, and congruence "all derive from the basic principle that the Fifth and Fourteenth Amendments to the Constitution protect *persons*, not *groups*." (Emphasis *sic*.)  *Id*., 515 U.S. at 227, 115 S.Ct. at 2112, 132 L.Ed.2d at 182.   Thus, the court concluded, "It follows from that principle that all governmental action based on race—a *group* classification long recognized as 'in

most circumstances irrelevant and therefore prohibited,' * * *—should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed." (Emphasis *sic*.) *Id*. at 227, 115 S.Ct. at 2112-2113, 132 L.Ed.2d at 182. Additionally, the court in *Adarand*, finding that government should be permitted to treat people differently on the basis of race "only for the most compelling reasons," held that "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Id*. at 227, 115 S.Ct. at 2113, 132 L.Ed.2d at 182. *Adarand*, therefore, specifically overruled *Metro Broadcasting*.

{¶ 110} In holding that all governmental classifications based on race are subject to strict scrutiny, the court in *Adarand* observed, "Our action today makes explicit what Justice Powell thought implicit in the *Fullilove* lead opinion: Federal racial classifications, like those of a State, must serve a compelling governmental interest, and must be narrowly tailored to further that interest. See *Fullilove*, 448 U.S., at 496 [100 S.Ct. at 2783-2784, 65 L.Ed.2d at 935-936] (concurring opinion). (Recall that the lead opinion in *Fullilove* 'd[id] not adopt * * * the formulas of analysis articulated in such cases as [*Bakke*].' *Id*., at 492 [100 S.Ct. at 2781, 65 L.Ed.2d at 933] (opinion of Burger, C.J.)." *Adarand*, 515 U.S. at 235, 115 S.Ct. at 2117, 132 L.Ed.2d at 187. The court went on to say, "Of course, it follows that to the extent (if any) that *Fullilove* held federal racial classifications to be subject to a less rigorous standard, it is no longer controlling. But we need not decide today whether the program upheld in *Fullilove* would survive strict scrutiny as our more recent cases have defined it." *Id*.

{¶ 111} In *Adarand*, the court also went out of its way to dispel a commonly held notion concerning strict scrutiny, stating, "[W]e wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.' * * * The unhappy persistence

of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it. * * * When race-based action is necessary to further a compelling interest, such action is within constitutional constraints if it satisfies the 'narrow tailoring' test this Court has set out in previous cases." *Id*. at 237, 115 S.Ct. at 2117, 132 L.Ed.2d at 188.

{¶ 112} Finally, in *Adarand*, the court observed that "[b]ecause our decision today alters the playing field in some important respects, we think it best to remand the case to the lower courts for further consideration in light of the principles we have announced." *Id*. at 237, 115 S.Ct. at 2118, 132 L.Ed.2d at 188. The *Adarand* majority noted, "The Court of Appeals did not decide the question whether the interests served by the use of subcontractor compensation clauses are properly described as 'compelling.' It also did not address the question of narrow tailoring in terms of our strict scrutiny cases, by asking, for example, whether there was 'any consideration of the use of race-neutral means to increase minority business participation' in government contracting, *Croson*, *supra*, at 507 [109 S.Ct. at 729, 102 L.Ed.2d at 890], or whether the program was appropriately limited such that it 'will not last longer than the discriminatory effects it is designed to eliminate,' *Fullilove*, *supra*, at 513 [100 S.Ct. at 2792-2793, 65 L.Ed.2d at 947] (Powell, J., concurring)." *Adarand* at 237-238, 115 S.Ct. at 2118, 132 L.Ed.2d at 189. Additionally, the court in *Adarand* noted that numerous unresolved questions remained "concerning the details of the complex regulatory regimes implicated by the use of subcontractor compensation clauses." *Id*. at 238, 115 S.Ct. at 2118, 132 L.Ed.2d at 189. For example, one of the three routes to DBE certification apparently required an individualized inquiry into the disadvantage of each participant, another evidently did not, and the third was entirely unclear as whether individualized assessment of disadvantage was necessary or instead whether the race-based presumptions alone were enough for participation. *Id*. The court in

*Adarand* concluded, "The question whether any of the ways in which the Government uses subcontractor compensation clauses can survive strict scrutiny, and any relevance distinctions such as these may have to that question, should be addressed in the first instance by the lower courts." *Id*. at 238-239, 115 S.Ct. at 2118, 132 L.Ed.2d at 189. Thus, the court in *Adarand* did not review the constitutionality of any particular program but, rather, remanded the matter to the lower courts for strict scrutiny.

{¶ 113} Justice Scalia concurred in part and concurred in the judgment in *Adarand*, 515 U.S. at 239, 115 S.Ct. at 2118-2119, 132 L.Ed.2d at 189-190. Justice Scalia stated that he joined the court's opinion, except Part III-C and "except insofar as it may be inconsistent" with what he thereafter went on to say. *Id*., 515 U.S. at 239, 115 S.Ct. at 2118, 132 L.Ed.2d at 189-190. Justice Scalia stated that, in his view, there could never be a compelling interest "in discriminating on the basis of race in order to 'make up' for past racial discrimination in the opposite direction." *Id*. at 239, 115 S.Ct. at 2118, 132 L.Ed.2d at 190. He recognized that individuals wronged by unlawful discrimination should be made whole, but that there is no such thing as "either a creditor or a debtor race." *Id*. He also indicated that to pursue the concept of racial entitlement—no matter how good or benign the intention—is constitutionally unacceptable, and that in the eyes of government "we are just one race here"—"American." *Id*. at 239, 115 S.Ct. at 2119, 132 L.Ed.2d at 190. Finally, Justice Scalia observed that it was unlikely, if not impossible, that the challenged program could survive under his view of strict scrutiny but that he was nevertheless content to leave that issue to be decided on remand.

{¶ 114} Justice Thomas also concurred in part and concurred in judgment in *Adarand*. He agreed with the adoption of strict scrutiny for all racial classifications, but wrote separately to address what he perceived to be an underlying premise of the dissenting opinions of Justices Stevens and Ginsburg— "that there is a racial paternalism exception to the principle of equal protection."

*Id*., 515 U.S. at 240, 115 S.Ct. at 2119, 132 L.Ed.2d at 190. Justice Thomas stated: "That these programs may have been motivated, in part, by good intentions cannot provide refuge from the principle that under our Constitution, the government may not make distinctions on the basis of race. As far as the Constitution is concerned, it is irrelevant whether a government's racial classifications are drawn by those who wish to oppress a race or by those who have a sincere desire to help those thought to be disadvantaged." *Id*. He also thought that "benign" discrimination fostered illegitimate notions that minorities cannot compete without a certain "patronizing indulgence," and that "benign" classifications "engender attitudes of superiority," and "stamp minorities with a badge of inferiority and may cause them to develop dependencies or to adopt an attitude [of entitlement]." *Id*. at 241, 115 S.Ct. at 2119, 132 L.Ed.2d at 191. Justice Thomas concluded, "In my mind, government-sponsored racial discrimination based on benign prejudice is just as noxious as discrimination inspired by malicious prejudice. In each instance, it is racial discrimination, plain and simple." (Footnote omitted.) *Id*.

{¶ 115} Justice Stevens wrote a dissenting opinion in *Adarand*, which was joined by Justice Ginsburg. *Id*., 515 U.S. at 242-264, 115 S.Ct. at 2120-2131, 132 L.Ed.2d at 191-205. In that dissent, Justice Stevens took the majority to task on a number of issues. He rejected the court's concept of consistency because it made the untenable assumption that there is "no significant difference between a decision by the majority [race] to impose a special burden on the members of a minority race and a decision by the majority to provide a benefit to certain members of that minority notwithstanding its incidental burden on some members of the majority." *Id*., 515 U.S. at 243, 115 S.Ct. at 2120, 132 L.Ed.2d at 192. Justice Stevens found that there was no such "moral or constitutional equivalence between a policy that is designed to perpetuate a caste system and one that seeks to eradicate racial subordination." *Id*. He noted that the concept of consistency espoused by the *Adarand* majority would simply "disregard the difference between a 'No

Trespassing' sign and a welcome mat." *Id*. at 245, 115 S.Ct. at 2121, 132 L.Ed.2d at 193. Justice Stevens concluded that a "single standard that purports to equate remedial preferences with invidious discrimination cannot be defended in the name of 'equal protection.' " *Id*. at 246, 115 S.Ct. at 2122, 132 L.Ed.2d at 194.

{¶ 116} In his dissent in *Adarand*, Justice Stevens also found the court's concept of congruence to be seriously misguided, stating that, in his judgment, "Congressional deliberations about a matter as important as affirmative action should be accorded far greater deference than those of a State or municipality." *Id*., 515 U.S. at 255, 115 S.Ct. at 2126, 132 L.Ed.2d at 200. He viewed the court's concept of congruence as a "sudden and enormous departure from the reasoning in past cases." *Id*. at 252-253, 115 S.Ct. at 2125, 132 L.Ed.2d at 198. Moreover, he determined, "If the 1977 program of race-based set-asides [upheld in *Fullilove*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902] satisfied the strict scrutiny dictated by Justice Powell's vision of the Constitution—a vision the Court expressly endorses today—it must follow as night follows day that the Court of Appeals' judgment upholding this more carefully crafted program should be affirmed." *Adarand* at 264, 115 S.Ct. at 2130, 132 L.Ed.2d at 205.

{¶ 117} Additionally, two other dissenting opinions were filed in *Adarand*. One was authored by Justice Souter and was joined by Justices Ginsburg and Breyer. *Id*. at 264-271, 115 S.Ct. at 2131-2134, 132 L.Ed.2d at 205-210. The other dissent was authored by Justice Ginsburg and was joined by Justice Breyer. *Id*. at 271-276, 115 S.Ct. at 2134-2136, 132 L.Ed.2d at 210-213.

III

{¶ 118} In light of the foregoing authorities, the strict scrutiny standard clearly applies to our review of Ohio's MBE set-aside program, and, specifically, R.C. 122.71(E), which defines "minority business enterprise" with explicit reference to race, and the relevant provisions of R.C. 125.081 and 123.151, requiring that approximate percentages of the state's contracts must be set aside for

competitive bidding by MBEs only. To survive strict scrutiny, the state's race-based program must be justified by a compelling governmental interest, and the means chosen by the state to effectuate its purposes must be sufficiently narrowly tailored. With the foregoing cases to guide us, however, the question we must decide, *i.e.*, whether the program at issue meets strict scrutiny, is far easier asked than answered.

**{¶ 119}** There is no question that a state has a compelling interest in remedying the past and present effects of identified racial discrimination within its jurisdiction where the state itself was involved in the discriminatory practices. See, generally, *Wygant*, 476 U.S. at 277-278, 106 S.Ct. at 1848-1849, 90 L.Ed.2d at 270-271 (plurality opinion); *id.* at 286, 106 S.Ct. at 1853, 90 L.Ed.2d at 276 (O'Connor, J., concurring in part and concurring in judgment) ("The Court is in agreement that * * * remedying past or present racial discrimination by a state actor is a sufficiently weighty state interest to warrant the remedial use of a carefully constructed affirmative action program"); and *United States v. Paradise* (1987), 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203, 220 ("The Government unquestionably has a compelling interest in remedying past and present discrimination by a state actor"). See, also, *Croson*, 488 U.S. at 490-493, 109 S.Ct. at 720-721, 102 L.Ed.2d at 880-881 (discussing the limitations on the use of race-based affirmative-action measures by state or local governments). A state also has a compelling interest in redressing discrimination by private parties within its jurisdiction where the state was a participant in a system of discriminatory exclusion. See, generally, *id*. at 492, 109 S.Ct. at 721, 102 L.Ed.2d at 881 (recognizing that "[i]f the city could show that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of the local construction industry, we think it clear that the city could take affirmative steps to dismantle such a system"). Moreover, "[i]t is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not

serve to finance the evil of private prejudice." *Id*. at 492, 109 S.Ct. at 721, 102 L.Ed.2d at 881. In addition to the foregoing legal authorities, it is also, from our perspective, the truly right thing to do.

{¶ 120} To determine whether a state can establish a compelling interest in set-aside programs like the one at issue here, it is necessary to consider the factual predicate offered in support of the program. See *id.*, 488 U.S. at 498-500, 109 S.Ct. at 724-725, 102 L.Ed.2d at 884-886. Evidence demonstrating a systematic pattern of exclusion of minorities from public contracting opportunities can, in certain circumstances, provide a competent legislative body with the authority to adopt a narrowly tailored racial preference to break down patterns of discriminatory exclusion. *Id*. at 509, 109 S.Ct. at 730, 102 L.Ed.2d at 892. The factual predicate supporting the adoption of a race-preference program must have provided the legislative body with a " 'strong basis in evidence for its conclusion that remedial action was necessary.' " *Id*. at 500, 109 S.Ct. at 725, 102 L.Ed.2d at 886, quoting *Wygant*, 476 U.S. at 277, 106 S.Ct. at 1849, 90 L.Ed.2d at 271.

{¶ 121} In the case at bar, the state of Ohio, through ODAS, seeks to establish its compelling interest in the MBE program. ODAS contends that the state of Ohio enacted the MBE program for the purpose of redressing the past and lingering effects of identified racial discrimination in the area of state construction and procurement contracting. ODAS asserts that the state's interest was compelling in that the state was a participant in the discrimination and the General Assembly had a " 'strong basis in evidence' to support its conclusion that remedial action was necessary." The trial court and the court of appeals did not consider this issue in any detail but, rather, concluded that although the state's interest in adopting the MBE program may have been compelling, the MBE program was not narrowly tailored. However, we believe that it is simply impossible to reach such a conclusion without a detailed consideration of the nature and extent of the state's interest in having adopted the MBE set-aside program. Indeed, upon a careful

review of the state's arguments in this case, it clear to us that the General Assembly had a "strong basis" in evidence to support its conclusion that Ohio's program was necessary to redress a pattern of discriminatory exclusion of minorities from state contracting opportunities and, thus, had a compelling governmental interest for adopting the MBE program.

IV

{¶ 122} R.C. 122.71(E)(1), 123.151, and 125.081 were originally enacted in 1980 as part of Am.Sub.H.B. No. 584, 138 Ohio Laws, Part II, 3062, 3065, 3081-3085, 3088-3090 (the "1980 MBE Act"), a comprehensive legislative scheme that established, among other things, minority business loan and bonding programs and requirements for the setting aside of approximate percentages of the state's construction and procurement contracts for MBEs. The 1980 MBE Act was passed by the General Assembly several months after the United States Supreme Court's decision in *Fullilove*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902, and, in a number of respects, Ohio's program was substantially similar to the type of program upheld in *Fullilove*.

{¶ 123} In the early 1980s, the constitutionality of certain portions of the 1980 MBE Act, as amended, and, specifically, the provisions requiring set-asides for minority businesses enterprises (*i.e.*, R.C. 122.71, 123.151, and 125.081), were challenged in federal district court in *Ohio Contractors Assn. v. Keip* (Dec. 15, 1982), S.D.Ohio No. C-2-82-446, unreported, reversed (C.A.6, 1983), 713 F.2d 167. The district court struck down the challenged statutes under the Equal Protection Clause of the Fourteenth Amendment. However, on appeal, the United States Sixth Circuit Court of Appeals reversed the judgment of the district court and upheld the challenged provisions. The Sixth Circuit's decision in *Keip* was based on the available precedents at that time, namely, the several opinions in *Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750, and in *Fullilove*. Thus, it was decided without the benefit of the United States Supreme Court's decisions since

*Fullilove*. See *Michigan R. Builders Assn., Inc. v. Milliken* (C.A.6, 1987), 834 F.2d 583, 589, affirmed 489 U.S. 1061, 109 S.Ct. 1333, 103 L.Ed.2d 601. However, both the district court and circuit court decisions in *Keip* are nonetheless relevant here because, among other things, they detail some of the information the General Assembly considered in enacting the 1980 MBE Act and, thus, help to develop the historical background and the pertinent factual predicate upon which the General Assembly relied when it passed the legislation requiring set-asides of approximate percentages of the state's contracts for bidding by MBEs only.

{¶ 124} Ohio's participation in a pattern of discriminatory practices against minorities in the area of state contracting was documented and established by judicial decision as early as 1967. In *Ethridge v. Rhodes* (S.D.Ohio 1967), 268 F.Supp. 83, 14 Ohio Misc. 43, 41 O.O.2d 396, the United States District Court for the Southern District of Ohio found that the state had become a joint participant with private industry and certain craft unions in a continual pattern of racially discriminatory conduct that excluded qualified black laborers from access to job opportunities on public construction projects. *Id*. at 87-88, 14 Ohio Misc. at 49-50, 41 O.O.2d at 399-400. The court in *Ethridge* condemned state officials for their "shocking lack of concern" for the "inevitable discrimination" that would result from entering into and performing under proposed contracts with contractors who had regularly denied equal employment opportunity on the basis of race. *Id*. at 88, 14 Ohio Misc. at 50, 41 O.O.2d at 400. The court determined that the state's use of nondiscrimination clauses in state construction contracts was totally inadequate to eliminate the pattern of racially discriminatory practices that the state had allowed to exist. *Id*. Testimony in *Ethridge* established that the Ohio Civil Rights Commission had been totally ineffectual in redressing the persistent pattern of racial discrimination. *Id*. at 89, 14 Ohio Misc. at 52, 41 O.O.2d at 401. Finding that the state's participation and acquiescence in the discriminatory practices of contractors and craft unions had violated the Equal Protection Clause, the court in

*Ethridge* enjoined the state from entering into the proposed contracts with the proposed contractors without first obtaining reasonable assurances that equal employment opportunities were to be made available. *Id*. at 89-90, 14 Ohio Misc. at 52-53, 41 O.O.2d at 401-402. Significantly, the General Assembly was well aware of the *Ethridge* decision at the time Am.Sub.H.B. No. 584, 138 Ohio Laws, Part II, 3062 *et seq.* (the 1980 MBE Act) was under consideration. See, generally, *Keip*, 713 F.2d at 170-171. See, also, *Keip*, S.D.Ohio No. C-2-82-446, unreported, at 9-10.

{¶ 125} During the early 1970s, Ohio Governor John J. Gilligan cited *Ethridge* in an executive order. Specifically, the Governor issued an order dated January 27, 1972, directing all state agencies to eliminate discriminatory barriers to employment, including "efforts required to remedy all effects of *present and past discriminatory patterns and practices* and those actions necessary to guarantee equal employment opportunity for all people." (Emphasis added.) The purpose of this order was, among other things, to increase minority participation in state contracting opportunities. The Governor's 1972 order was part of the evidentiary mosaic considered by members of the Ohio General Assembly at the time the 1980 MBE Act was under consideration. *Keip*, 713 F.2d at 171 ("A series of executive orders issued by the Governor of Ohio subsequent to 1967 was designed to increase participation by members of minority groups in state contracts. These orders were circulated to members of the legislature while the MBE act was under consideration"). In *Keip*, Governor Gilligan testified that, during his administration, he was aware of the difficulties experienced by minority businesses and small businesses in obtaining state contracts. S.D.Ohio No. C-2-82-446, unreported, at 10. He testified that the cause of the difficulty was the existence of " 'an old boys' club sort of relationship' " between state officials and a number of established and reputable firms with a great deal of experience that " 'tended to get the lion's share of the business.' " *Id*. He had also informally urged cabinet

members and department heads to seek out qualified minorities and small businesses for public projects, but the results of that informal affirmative-action initiative were apparently unknown. *Id.*

{¶ 126} In 1977, the General Assembly created a form of affirmative action for minority contractors as part of Am.Sub.H.B. No. 618, 137 Ohio Laws, Part II, 3100, a biennial capital-improvement appropriations Act. Am.Sub.H.B. No. 618 approved funding for, among other things, capital-improvement projects throughout the state. Section 13 of the bill provided: "No funds shall be appropriated as utilized for any purpose pursuant to this Act unless the project for which such funds are appropriated or utilized provides for an affirmative action program for the employment and effective utilization of disadvantaged persons whose disadvantage may arise from cultural, racial or ethnic background, or other similar cause including, without limitation, race, religion, sex, national origin, or ancestry." 137 Ohio Laws, Part II, 3129. Additionally, Section 13 provided, "The Ohio Board of Regents for all higher education projects, and the Department of Administrative Services for all other capital projects, shall identify and designate specific capital improvements projects, or specific contracts or sub-contracts to be awarded as part of such projects, for which minority business enterprises or small businesses, after certification of eligibility [by the Regents or by ODAS], shall be invited to participate in the competitive bidding procedures for such projects, contracts, or sub-contracts as set forth in Chapters 127. and 153. of the Revised Code." 137 Ohio Laws, Part II, 3130-3131. Section 13 defined "minority business enterprise" as a business "at least fifty-one percent of which is owned by United States citizens who are *black, Hispanic, Orientals*, women, *or American Indians*, or a business in which at least fifty-one per cent [of the stock is owned by such persons]." (Emphasis added.) 137 Ohio Laws, Part II, 3129.

{¶ 127} Following passage of the 1977 Act, Section 13 was apparently interpreted by certain state agencies or actors to restrict bidding on a portion of the

capital improvement contracts to minority businesses only. Thus, certain parties sued in the Court of Common Pleas of Franklin County, seeking to enjoin such restrictions and challenging the constitutionality of Section 13. See *Ohio Bldg. Chapter, AGC v. Jackson* (Sept. 28, 1979), Franklin C.P. Nos. 78CV-05-2343 and 79CV-01-247, unreported. Judge George E. Tyack of the common pleas court, on the eve of the expiration of the two-year operation of the appropriations measure, issued a decision upholding the constitutionality of Section 13, *id*. at 5, stating: "From the evidence submitted in the instant case, the Court fully realizes there are many factors that affect the ability of the minority groups outlined in Section 13 of [Am.Sub.H.B. No. 618]. These include problems of financing, ability to obtain performance bonds, the variable costs of performance bonds, labor problems and, probably, experience in the contracting field. These factors may well have been a cause, if not the cause, of the provisions of [Am.Sub.H.B. No. 618]." *Id*. at 4. However, he went on to conclude: "This Court finds *from the evidence submitted* that there exists in the awarding of state contracts a *discrimination against the minority groups specified* in [Section 13, Am.Sub.H.B. No. 618]. *The Court finds that there is a compelling need to correct this discrimination*." (Emphasis added.) *Id*. at 5.[6]

{¶ 128} Members of the General Assembly were aware of this decision at the time the 1980 MBE Act was pending for consideration. Indeed, it appears that Senator Bowen, the chief sponsor of the set-aside provisions of Am.Sub.H.B. No. 584 (and the chairman of the committee that reported it to the Ohio Senate),

---

6. We note, in passing, that in *Ohio Contractors Assn. v. Keip* (Dec. 15, 1982), S.D.Ohio No. C-2-82-446, unreported, reversed (C.A.6, 1983), 713 F.2d 167, the United States District Court for the Southern District of Ohio determined that Judge George E. Tyack's findings of discrimination in *Ohio Bldg. Chapter, AGC v. Jackson* (Sept. 28, 1979), Franklin C.P. Nos. 78CV-05-2343 and 79CV-01-247, unreported, against the minority groups listed in Section 13, Am.Sub.H.B. No. 618, 137 Ohio Laws, Part II, 3100, 3129, were findings of "societal" as opposed to "unlawful" discrimination. *Keip*, S.D.Ohio No. C-2-82-446, unreported, at 13, fn. 7. While this view of the district court is interesting, we are obviously not bound by it.

circulated copies of that decision to the members of both houses of the General Assembly while the bill was pending.  See *Keip*, S.D.Ohio No. C-2-82-446, unreported, at 13.  See, also, *Keip*, 713 F.2d at 171.

{¶ 129} In connection with the litigation in *Ohio Bldg. Chapter, AGC*, Franklin C.P. Nos. 78CV-05-2343 and 79CV-01-247, unreported, ODAS had gathered statistical data from records of past capital-improvement contracts awarded by the state between 1957 and 1979.  The statistical data revealed that "identifiable minority businesses obtained a very small portion of the prime capital improvement projects" awarded by the state.  *Keip*, S.D.Ohio No. C-2-82-446, unreported, at 15.  "The actual amount in terms of dollar value * * * was $4,265,797.44 out of a total of $2,004,301,803.33, or roughly 0.21 percent."  *Id*. at 15-16.  See, also, *Keip*, 713 F.2d at 171 (finding that a study performed by ODAS "showed that in the period from 1959 to 1975 the state paid out $1.14 billion in general construction contracts," and that "[o]nly 0.24% of these payments went to minority businesses").  Additionally, in 1977, the Ohio Legislative Budget Office ("LBO") obtained minority participation figures for fiscal years 1975, 1976, and 1977 pertaining to the Ohio Department of Transportation's construction contracts.  "In terms of dollar value, these figures showed minority participation to be 0.13 percent, 0.3 percent, and 0.18 percent for the three years respectively."  *Id*. at 16.  All this information was before the General Assembly at the time the 1980 MBE Act was pending, as were statistics indicating that minority businesses represented approximately 6.7 percent of the total number of Ohio businesses.  *Id*. at 15-16.

{¶ 130} Further, in 1978, Ohio Attorney General William J. Brown established a Task Force on Minorities in Business to examine the relationship between state government and minority business, and to develop ways to make that relationship more effective, efficient, and equitable.  The task force was directed to review state laws, practices, and services relating to minority-owned businesses and to recommend legislative, administrative, and fiscal measures to enhance assistance

to small businesses in general and to minority-owned businesses in particular. During 1978, the task force convened regional public hearings to gather information from practitioners, experts, and interested citizens. The task force also conducted several working sessions over a period of nine months to discuss and to analyze information gathered from the hearings and from the task force's independent research. In October 1978, the task force issued a final report documenting the results of its ten months of study and deliberation.

{¶ 131} The task force found a grave numerical imbalance in the number of public contracts awarded to minority-owned businesses in Ohio. Statistics revealed that from 1975 to 1977, minority-owned businesses accounted for approximately seven percent of all Ohio businesses, but had received less than one-half of one percent of all state purchase contracts. The task force concluded that minority businesses were receiving less than one-fourteenth of their proportionate share of state contracts. In its report, the task force noted that certain state officials and state agencies had undertaken efforts to increase minority participation in state contracting opportunities, but that those efforts had been largely ineffectual. The task force identified certain needs of minority business enterprises, including the need for a better method of receiving information on impending public contracts, the need to overcome bonding barriers, and the need for the state to correct delays in paying for completed work. The report also discussed the option of a mandatory set-aside program and noted that witnesses at the public hearings had agreed that set-asides were necessary to increase minority business participation in state contracts. In addition to the need for set-asides, the report noted that several witnesses had also suggested that the state needed to more aggressively encourage joint business arrangements between minority firms and nonminority firms.

{¶ 132} The task force made several recommendations for legislative and administrative assistance to minority business enterprises, and specifically recommended, among other things, the adoption of a ten-percent affirmative-action

goal for state purchase contracts for goods, services, and construction. The 1978 task force report was widely circulated and distributed to members of the General Assembly while the 1980 MBE Act was pending for consideration. See *Keip*, S.D.Ohio No. C-2-82-446, unreported, at 15. See, also, *Keip*, 713 F.2d at 171.

{¶ 133} The progress of the 1980 MBE Act through the General Assembly was unremarkable by legislative standards. In March 1980, the Ohio House of Representatives passed a version of Am.Sub.H.B. No. 584 by a vote of eighty-five to six and sent the bill to the Ohio Senate for its consideration and concurrence. 138 Ohio House Journal, Part II, 2136; 138 Ohio Senate Journal 1665. However, the version of the bill passed by the House did not contain the set-aside provisions, which were later incorporated into the bill and then codified in former R.C. 123.151 and 125.081. Upon receipt of the bill from the House of Representatives, the Senate referred it to the Senate Committee on Commerce and Labor. 138 Ohio Senate Journal 1724. That committee considered the bill, incorporated the minority set-aside requirements for state contracts (*i.e.*, the predecessor versions of R.C. 123.151 and 125.081), conducted public hearings, considered statistical data concerning the level of minority participation in state contracts, and approved the adoption of the set-aside provisions. *Keip*, S.D.Ohio No. C-2-82-446, unreported, at 7. On September 11, 1980, the committee reported a substitute bill back to the full Senate and recommended its passage. 138 Ohio Senate Journal 2125. On November 24, 1980, the Senate passed Am.Sub.H.B. No. 584, by a vote of twenty-five to seven, after making amendments. 138 Ohio Senate Journal 2339-2343. During debates on the floor of the Senate, Senator Bowen explained how the set-aside provisions would operate and indicated that there was no need for him to elaborate on the merits of the bill, since the component parts of the legislation were understood. *Keip*, S.D.Ohio No. C-2-82-446, unreported, at 8, citing Transcript of Proceedings before the Ohio Senate. Several other senators spoke in favor of the bill. *Id*. One senator expressed his belief that the bill would provide equal opportunity and his

hope that someday set-asides would not be necessary. *Id.* Another senator stated that the bill would go a long way in helping minorities develop their companies. *Id.* On November 25, 1980, the day after the Senate passed the bill, the House of Representatives, by a vote of sixty-four to twenty-four, concurred in the Senate amendments without floor debate. 138 Ohio House Journal, Part II, 2950.

{¶ 134} The purpose of the 1980 MBE Act, as stated in its title, was to amend certain sections of the Revised Code and "to enact sections 122.71 to 122.85, 122.87 to 122.89, 122.92 to 122.94, 123.151, 125.081, 125.111, and 4115.032 of the Revised Code to establish a minority business development loan program, to provide construction contract bonds for minority businesses unable to obtain them from private sources, to set aside 5% of state construction contracts and 15% of procurement contracts for minority businesses, to require a portion of every state construction contract to be reserved for minority subcontractors and materialmen, to require all state and local procurement contracts to contain anti-discrimination clauses, and to make an appropriation." 138 Ohio Laws, Part II, 3062. The bill contained no explicit findings of discrimination, and there was no express statement in the bill indicating that its purpose was to correct past discriminatory practices against minority businesses in which the state was involved. However, it is evident from the text of the Act and the facts and circumstances surrounding its enactment that the purpose of the legislation and, particularly, the MBE set-aside provisions was to halt and to redress past practices in which the state was involved in discrimination against minority contractors.

{¶ 135} In *Keip*, 713 F.2d 167, the United States Sixth Circuit Court of Appeals, in reviewing the legislative history of the Act, reached this same conclusion, stating, "While the act did not contain a preamble which stated in so many words that its purpose was to correct past practices by which the state was involved in discrimination against minority contractors its purpose and objective were absolutely clear from the text and the hearings and floor debate which

preceded final enactment. In addition, this legislation was considered and adopted against a 'backdrop' which must have made the members aware of the problem and the necessity for action." *Id*. at 170. Additionally, the court in *Keip* went on to state, "When viewed against this 'backdrop' there can be no doubt that the members of the Ohio legislature understood the situation which produced the MBE act and the purposes for which it was offered. * * * [I]t is clear from the overwhelming approval of the MBE act that the members [of the General Assembly] accepted the findings of Ohio courts, executive department investigations and earlier studies by committees of the legislature itself." *Id*. at 171. Furthermore, our research indicates that an early version of the bill contained specific language explaining that the legislation was to remedy the past discrimination minority businesses had experienced in state contracting opportunities. However, that language was deleted at some point during the legislative process, presumably because the remedial objectives of the legislation, as finally enacted, were obvious to everyone.

{¶ 136} Given the evidence that was before the General Assembly when it considered and passed the 1980 MBE Act, we think it clear that the General Assembly had a "strong basis in evidence" for finding that remedial action was necessary to ameliorate the effects of identified racial discrimination in which the state itself had either actively or passively participated. Prior to the enactment of the legislation, the General Assembly and other state governmental entities and officials had examined and had attempted to redress the nearly nonexistent minority participation in public contracting opportunities. The General Assembly knew that these prior efforts had not been sufficient to remedy the problem. The General Assembly was aware of judicial and executive findings of discrimination in state contracting, the state's involvement and acquiescence in a pattern of discriminatory practices, and the debilitating effects that such discriminatory practices had on the ability of MBEs to compete in the state contracting system. The General Assembly considered the task force report and a vast array of statistical evidence showing a

severe numerical imbalance in the amount of business engaged in between the state and minority contractors. The evidence before the General Assembly showing the gross statistical imbalance is precisely the type of evidence that may give rise to an inference of discriminatory exclusion and that may justify a finding that remedial action was necessary. Obviously, the General Assembly's factfinding process is entitled to a presumption of regularity and deferential review by this court, not *blind* judicial deference, but deference nonetheless.

{¶ 137} In *Croson*, the United States Supreme Court found that the factual predicate relied on by the city of Richmond in adopting an MBE set-aside program did not amount to a strong basis in evidence to support the city's conclusion that remedial action was necessary. *Id*., 488 U.S. at 498-506, 109 S.Ct. at 724-728, 102 L.Ed.2d at 884-890. The court found that the city's recitation of a remedial purpose for the program was entitled to little or no weight. *Id*. at 500, 109 S.Ct. at 725, 102 L.Ed.2d at 886. The court found that the city's reliance on certain statements that discrimination existed around the Richmond area and elsewhere in the country were of little probative value in establishing identified discrimination in the Richmond construction industry. *Id*. The court also found that the city's reliance on the statistical disparity between the number of prime contracts awarded to minority-owned businesses and the percentage of minorities in the city of Richmond was misplaced. *Id*. at 501-503, 109 S.Ct. at 725-726, 102 L.Ed.2d at 886-888. Additionally, the court determined that the city's reliance on evidence that there was a low percentage of MBE membership in local constructors' associations was also misplaced because, among other things, the city had no evidence upon which to make any probative statistical comparisons. *Id*. at 503, 109 S.Ct. at 726-727, 102 L.Ed.2d at 888. Further, the court determined that the city's reliance on congressional findings of nationwide discrimination in the construction industry were of extremely limited value in demonstrating the existence of discrimination in Richmond, and the court also noted the necessity for state or local governments to

base determinations of discrimination on their own factfinding processes. *Id*. at 504, 109 S.Ct. at 727, 102 L.Ed.2d at 888-889. The court concluded that because none of the evidence presented by the city had pointed to any identifiable discrimination in the Richmond construction industry, the city had failed to demonstrate a compelling interest in apportioning contracting opportunities on the basis of race. *Id*. at 505, 109 S.Ct. at 728, 102 L.Ed.2d at 889.

{¶ 138} The case at bar is distinguishable from the Richmond experience for a number of reasons. When Ohio's General Assembly enacted the 1980 MBE program, the General Assembly had a wealth of evidence before it. The evidence considered by the General Assembly included past judicial decisions confirming the existence of discrimination in state contracting and establishing the state's acquiescence in such discriminatory practices, executive findings of discrimination in state contracting opportunities, administrative findings of the need for affirmative action, testimony of opponents and proponents of minority set-asides, and a host of relevant statistical evidence showing the severe numerical imbalance in the amount of business the state did with minority-owned enterprises. The evidence that was before the General Assembly showed, *inter alia*, a gross statistical disparity *between the number of qualified MBEs in Ohio and the number of contracts awarded to Ohio's minority businesses*. The 1978 task force report indicated, among other things, that minority businesses constituted approximately seven percent of all Ohio businesses, but that minority businesses were receiving less than one-half of one percent of state purchasing contracts. A study by ODAS also indicated a disparity in the general construction contracts awarded to minority businesses, as did a report issued by Legislative Budget Office. In our judgment, this type of relevant statistical data, coupled with all other pieces of the evidentiary mosaic considered by the General Assembly, is precisely the type of probative evidence of identified racial discrimination found lacking in *Croson.*

**{¶ 139}** *Croson* itself in this regard buttresses our conclusion. Specifically, we note that in *Keip*, 713 F.2d 167, the United States Sixth Circuit Court of Appeals, in upholding Ohio's set-aside program, relied on the 1967 decision in *Ethridge*, 14 Ohio Misc. 43, 41 O.O.2d 396, 268 F.Supp. 83 (establishing the state's joint participation in a pattern of racially discriminatory conduct), the data revealing a severe numerical imbalance between the percentage of minority businesses in Ohio, and the percentage of state purchasing contracts awarded to minority businesses. *Keip* at 171. In *Croson*, the United States Supreme Court cited *Keip* twice, apparently to provide an example in which consideration of relevant statistical data and other predicate facts could give rise to an inference of a pattern of discriminatory conduct supporting an MBE set-aside program. *Croson*, 488 U.S. at 502-503, 109 S.Ct. at 726-727, 102 L.Ed.2d at 887-888.

**{¶ 140}** Moreover, Ohio's MBE program was clearly not enacted to redress " 'societal discrimination,' an amorphous concept of injury that may be ageless in its reach into the past," *Bakke*, 438 U.S. at 307, 98 S.Ct. at 2757, 57 L.Ed.2d at 782. Nor was it aimed at merely "[s]ocietal discrimination, without more." *Wygant*, 476 U.S. at 276, 106 S.Ct. at 1848, 90 L.Ed.2d at 270. The program was not based on "a generalized assertion that there has been past discrimination in an entire industry [which] provides no guidance to a legislative body to determine the precise scope of the injury it seeks to remedy," "the sorry history of both public and private discrimination in this country * * * standing alone," or "an amorphous claim that there has been past discrimination in a particular industry." *Croson* at 498-499, 109 S.Ct. at 724, 102 L.Ed.2d at 885. Rather, we find that the information that was before the General Assembly provided it with a firm basis in evidence for believing that remedial action was necessary, and, thus, the General Assembly had a compelling interest to adopt the legislation apportioning public contracting opportunities on the basis of race. Therefore, since the compelling nature of the state's interests in redressing racial discrimination in which the state itself had

participated is clear, we turn now to the question whether the means chosen by the state to effectuate its interests are sufficiently narrowly tailored.

V

{¶ 141} The trial court and the court of appeals found that Ohio's MBE program, as administratively applied to deny appellee's application for MBE recertification on the basis of race *per se*, violated the Equal Protection Clause of the Fourteenth Amendment. The trial court and the court of appeals acknowledged that the MBE program was designed to redress past racial discrimination, and recognized that the state's interest in remedying past discrimination is or may be compelling. Nevertheless, the trial court and the court of appeals concluded that equal protection required participation by every disadvantaged business enterprise in the state regardless of the business owner's race. In so holding, the courts below essentially ignored the state's compelling interest in having adopted the MBE program in the first instance, *i.e.*, to redress the lingering effects of past, documented racial discrimination against the particular minority groups listed in R.C. 122.71(E)(1).

{¶ 142} The court of appeals' analysis in this case was similar to the analysis of the trial court in holding that Ohio's MBE program and, specifically, the definition of "minority business enterprise" in R.C. 122.71(E)(1) were not narrowly tailored to effectuate a compelling governmental interest. The court of appeals' majority acknowledged that the MBE program "is designed to remedy past discrimination," and that remedying past discrimination "may be" a compelling governmental interest. However, the court of appeals' majority concluded:

"While remedying past discrimination may be a compelling interest, we find it hard to envision a situation in which a race-based classification is narrowly tailored. The MBE program, as defined in R.C. 122.71(E)(1), is not narrowly tailored. The MBE program's racial classification appears to be based on the presumption that caucasians and other minority groups are not disadvantaged,

98

socially or economically, but that all members of the listed minority groups are socially and economically disadvantaged. The statute is both under-inclusive and over-inclusive. There may be socially and economically disadvantaged business owners who are excluded from the program simply because of their race, and at the same time, there may be business owners who are not socially and economically disadvantaged yet eligible to participate in the program simply because they are among the four enumerated minority groups."

{¶ 143} The court of appeals majority construed *Adarand*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158, to mean that "race may, in some circumstances, create a presumption of disadvantage, *but that other races cannot be excluded* based solely on statutory presumptions such as the one in R.C. 122.71(E)(1)." (Emphasis added.) The court of appeals' majority stated, "The goal of the MBE program ideally should be maximizing the opportunity for all Ohio citizens who are economically or socially disadvantaged." Accordingly, the court of appeals held that "the state's MBE program is a race *per se* classification which, as applied to the facts of this case, was unconstitutionally applied to deny appellee MBE certification." Therefore, the court of appeals affirmed the judgment of the trial court remanding the matter to ODAS for consideration of appellee's application for MBE recertification without regard to race.

{¶ 144} The fundamental flaw in the court of appeals' analysis is that it completely disregards the state's compelling interest in apportioning approximate percentages of public contracting opportunities for the benefit of the specific minority groups listed in R.C. 122.71(E)(1). The court of appeals majority thought that the goal of Ohio's program should "ideally" be to maximize public contracting opportunities for all economically or socially disadvantaged Ohio citizens. However, that is not what Ohio's MBE program was designed to do. The purpose of the MBE program was not to aid every disadvantaged business enterprise in the state—it was designed and continues to exist to redress past, documented racial

discrimination against the particular minority groups listed in R.C. 122.71(E)(1). To hold that members of *all races* must be allowed to participate in a program that was explicitly designed to redress documented racial discrimination against *certain discrete minorities* is a *non sequitur*. As the *amici* in this case point out: "Permitting all races to participate in a program explicitly designed to remedy discrimination against certain discrete minorities abandons the State's original compelling interest—erasing the lingering effects of race discrimination."

{¶ 145} In our judgment, Ohio's MBE program is not defective under the narrow-tailoring prong of strict scrutiny simply because the program does not apply to everyone. If the program were to fail for that reason alone, it is difficult to imagine how any program expressly designed to ameliorate documented racial discrimination against certain identifiable minority groups could ever survive strict scrutiny. Moreover, the court of appeals' majority, in finding it "hard to envision" a situation in which a racial classification could ever be narrowly tailored, apparently subscribed to the very notion that *Adarand* clearly rejected, *i.e.*, the notion that strict scrutiny is strict in theory, but fatal in fact. In *Adarand*, the United States Supreme Court stated:

"Finally, we wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.' * * * The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is *not disqualified* from acting in response to it. As recently as 1987, for example, every Justice of this Court agreed that the Alabama Department of Public Safety's 'pervasive, systematic, and obstinate discriminatory conduct' justified a narrowly tailored race-based remedy. See *United States v. Paradise*, 480 U.S., at 167 [107 S.Ct. at 1064, 94 L.Ed.2d at 221] (plurality opinion of Brennan, J.); *id*., at 190 [107 S.Ct. at 1076, 94 L.Ed.2d at 235] (Stevens, J., concurring in judgment); *id*., at 196 [107 S.Ct. at 1079-1080, 94 L.Ed.2d at 239] (O'Connor, J., dissenting). *When race-based action is necessary*

100

*to further a compelling interest, such action is within constitutional constraints if it satisfies the 'narrow tailoring' test this Court has set out in previous cases*." (Emphasis added.) *Adarand*, 515 U.S. at 237, 115 S.Ct. at 2117, 132 L.Ed.2d at 188.

{¶ 146} We find that Ohio's MBE program, which defines minority business enterprise with specific reference to race, is neither impermissibly underinclusive nor impermissibly overinclusive in its application to the facts of this particular case, or, for that matter, in its application in general. Thus, we reject the conclusion of the court of appeals to the contrary.

{¶ 147} As to the question of underinclusiveness, the fact that the MBE program does not apply to all races comports with the compelling state interest that gave rise to the program's adoption and implementation. R.C. 122.71(E)(1) defines "minority business enterprise" as business enterprises that are "owned and controlled by United States citizens, residents of Ohio, who are members of one of the following economically disadvantaged groups: Blacks, American Indians, Hispanics, and Orientals." The information that was considered by the General Assembly at the time Ohio's MBE program was first adopted in 1980 included information concerning the four specific minority groups specified in the definition quoted immediately above. For instance, the finding of discrimination and the need for action in *Ohio Bldg. Chapter, AGC*, Franklin C.P. Nos. 78CV-05-2343 and 79CV-01-247, unreported, pertained to the specific minority groups listed in Section 13, Am.Sub.H.B. No. 618, 137 Ohio Laws, Part II, 3100, 3129—*i.e.*, *the same* racial minority groups now listed in R.C. 122.71(E)(1)—Blacks, American Indians, Hispanics, and Orientals. Moreover, if the General Assembly had decided to randomly pick additional minority groups for inclusion into the MBE program, such as, for instance, persons of Lebanese ancestry, the MBE program would almost certainly fail under strict scrutiny. See, *e.g.*, *Croson*, 488 U.S. at 506, 109 S.Ct. at 728, 102 L.Ed.2d at 890, wherein the United States Supreme Court

specifically warned against the "random inclusion" of minority groups in an MBE set-aside plan. Further, we are aware of no evidence that, for instance, persons of Lebanese ancestry have suffered disadvantage and discrimination in the area of state contracting opportunities to the same degree and to the same extent that the minority groups listed in the current version of R.C. 122.71(E)(1) were determined to have suffered. Nevertheless, the court of appeals' majority thought that the MBE program should "ideally" apply to all of Ohio's disadvantaged businesses, and the court of appeals infused that concept into its holding in this case. However, deciding what Ohio's MBE program ideally is or should be is not a proper function for the judiciary. See, generally, *Fullilove*, 448 U.S. at 485, 100 S.Ct. at 2778, 65 L.Ed.2d at 929 (finding that federal MBE program limiting benefits to specified minority groups was not underinclusive simply because the remedial objectives of the legislation had not been extended to all disadvantaged groups, since "[s]uch an extension would, of course, be appropriate for Congress to provide; it is not a function for the courts").

{¶ 148} The court of appeals' majority also determined that the racial classification in R.C. 122.71(E)(1) was defectively overinclusive, *i.e.*, that the MBE program could conceivably bestow a benefit on certain MBEs that could not be justified on the basis of remedying the lingering effects of prior identified discrimination. However, as to the question of overinclusiveness, we do not view appellee's arguments in this case as even challenging the MBE program on that ground. Appellee's arguments in this case are that the program is *underinclusive.* That is, appellee wants the MBE program to be upheld, but with appellee participating in its benefits. Therefore appellee's *only objectives* here are to be *included* in the program. Appellee does argue at one point in its brief that under the state's application of the program, "a company such as Honda of America qualifies as an MBE only if it can prove 51% Japanese ownership." However, appellee challenges the program only as it was administratively applied to deny

appellee's application for MBE recertification. Further, there is absolutely no evidence in this case that Ohio's MBE program is or has been operated in a grossly overinclusive manner. This case is not about Honda of America or whether, in anyone's wildest imagination, that corporation could ever qualify for participation in Ohio's MBE program. This is *not* a case involving any particular award of any particular state contract to any particular business enterprise. Moreover, even if we were to assume that, on the facts of this case, appellee had standing to raise a claim that R.C. 122.71(E) is facially overinclusive, appellee specifically denies having raised any such challenge to the MBE program. In its brief, appellee specifically concedes that "Ritchey Produce never challenged the facial validity of the State's MBE program." Thus, under these circumstances, and on the basis of the facts giving rise to this appeal, we seriously question the propriety of the court of appeals' determination whether the MBE program, *as applied in this case*, is defectively *overinclusive*.

**{¶ 149}** In any event, the court of appeals' determination that the racial classification in R.C. 122.71(E)(1) is impermissibly overinclusive was apparently based upon the same flawed reasoning that drove the court to the conclusion that the program was defectively underinclusive. Therefore, it bears repeating that the purpose of the MBE program was to ameliorate the effects of a pattern of past, documented racial discrimination in which the state had participated to the detriment of the racial or ethnic minority groups listed in R.C. 122.71(E)(1). Contrary to the conclusion reached by the court of appeals, the MBE program is *not* a program that was designed to benefit all of Ohio's citizenry. The court of appeals observed that, as a result of the program, "[t]here may be socially and economically disadvantaged business owners who are excluded from the program simply because of their race, and at the same time, there may be business owners who are not socially and economically disadvantaged yet eligible to participate in the program simply because they are among the four enumerated minority groups."

However, given the purposes of Ohio's MBE program, we believe that this observation simply does not justify the court of appeals' holding in this case.

{¶ 150} In assessing the appropriateness of race-conscious remedies, courts have generally looked to several factors, including "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *Paradise*, 480 U.S. at 171, 107 S.Ct. at 1066, 94 L.Ed.2d at 223. In light of these and other factors, we find that Ohio's MBE program satisfies constitutional requirements.

{¶ 151} Much could be said concerning the appropriateness of the remedial relief embodied in Ohio's MBE program. However, we limit ourselves to only the following general observations.

{¶ 152} First, as outlined in our discussion in Part IV, above, Ohio's MBE program was enacted only *after* a host of earlier efforts designed to increase minority participation in state contracting opportunities had failed to eliminate the effects of racial discrimination in the area of state contracting. See, also, *Keip*, 713 F.2d at 174 ("The General Assembly had evidence that earlier efforts to increase minority participation in state business by various methods short of those contained in the MBE act, such as 'goals' set by executive orders and administrative regulations, had not been successful"). Further, as ODAS correctly points out, the MBE program has continually operated in conjunction with alternative race-neutral measures to increase minority participation in public contracting opportunities, and in conjunction with a host of other state-sponsored programs providing "assistance to minority business owners, with no impact whatsoever on non-minority businesses." Ohio's MBE program was and continues to be a central, necessary, and indispensable part of a remedial puzzle. It remains a valid remedial and prophylactic device that forms the foundation of the great wall that currently

104

separates Ohio from the discriminatory tendencies of its past in the area of state construction and procurement contracting.

{¶ 153} Second, Ohio's MBE program is unquestionably flexible. All set-aside requirements are to be met "approximately" (see, *e.g.*, R.C. 123.151[C][1] and 125.081[A]), and, as the state points out, the waiver provisions of the MBE program (see, *e.g.*, 123.151[C][3] and [4]), and the set-aside requirements have been applied in a flexible manner.

{¶ 154} Third, the numerical goals of the program have a direct relationship to Ohio's contracting market. In *Croson*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854, the United States Supreme Court disapproved the city of Richmond's MBE program because "the city [did] not even know how many MBE's in the relevant market [were] qualified to undertake prime or subcontracting work in public construction projects." *Id*. at 502, 109 S.Ct. at 726, 102 L.Ed.2d at 887. However, the court in *Croson* compared that situation to the situation in *Keip*, 713 F.2d 167, wherein the Sixth Circuit upheld Ohio's set asides by relying on the percentage of *minority businesses* in the state compared to the percentage of state purchasing contracts awarded to minority firms. *Croson* at 502, 109 S.Ct. at 726, 102 L.Ed.2d at 887. As set forth in our discussion in Part IV, above, the General Assembly had a vast array of evidence before it demonstrating, among other things, that minority businesses constituted approximately seven percent of all Ohio businesses, but were receiving less than one-half of one percent of all state purchasing contracts. The state contends, and we agree, that a program requiring that approximately five percent of the state's construction contracts and approximately fifteen percent of the state's contracts for supplies and services, etc., be set aside for Ohio MBEs was a modest response to a demonstrably grave situation. The goals of Ohio's program were directly related to Ohio's contracting market and were clearly not excessive— a far cry from the set-aside program struck down in *Croson*.

{¶ 155} Fourth, nonminority contractors are not wholly precluded from participation in contracts that are set aside for MBEs. For instance, the definition of "minority business enterprise" in R.C. 122.71(E) encourages legitimate collaborative partnerships and joint ventures between nonminority contractors and minority group members. As the court in *Keip* noted, nonminority contractors may participate in contracts set aside for award to minority business enterprises in a number of ways, including "by having up to 49% ownership or control of a minority establishment." *Id.*, 713 F.2d at 174; R.C. 122.71(E)(1) and (2).

{¶ 156} Fifth, Ohio's MBE program contains administrative definitions and procedures to ensure participation by qualified MBEs only, although the case at bar may not be a prime example of that fact. The facts of this case do demonstrate, however, that complaints of improper certification are taken seriously and that administrative errors in the application of the program can be easily rectified. Administrative definitions also add clarity to the statutory (R.C. 122.71[E][1]) identification of the particular minority groups encompassed in the program. See Ohio Adm.Code 123:2-15-01(A)(6) through (9) (defining "Blacks," "American Indians," "Hispanics," and "Orientals" with particularity). Additionally, the administrative rules provide for careful scrutiny of applications for MBE certification, so that spurious minority-front entities will be identified during the investigative process and will be excluded from the program. Ohio Adm.Code 123:2-15-01. Further, MBE certification may not be granted for a period exceeding one year, and applicants must annually revise their applications and information for purposes of MBE recertification. See, *e.g.*, Ohio Adm.Code 123:2-15-01(C). This process ensures that only qualified MBEs remain in the program.

{¶ 157} Sixth, the General Assembly has provided for harsh criminal penalties to discourage unjust participation in the MBE program. Specifically, anyone who intentionally misrepresents himself or herself as owning, controlling, operating, or participating in a minority business enterprise for purposes of

participating in the benefits of the program is guilty of a criminal offense, *i.e.*, theft by deception. R.C. 123.151(I) and 125.081(F).

{¶ 158} Seventh, the definition of "minority business enterprise" in R.C. 122.71(E)(1) contains an appropriate geographic limitation for the program, *i.e.*, MBEs are defined as those businesses that are "owned and controlled by United States Citizens, residents of Ohio." Thus, unlike the program struck down in *Croson*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854, which applied to MBEs from anywhere in the country, the General Assembly appropriately limited the benefits of Ohio's MBE program to Ohio's MBEs.

{¶ 159} Eighth, the operation of Ohio's MBE program is subject to continuing reassessment and reevaluation. For instance, R.C. 123.151(H) imposes stringent reporting requirements pertaining to the contracting obligations of ODAS and other state agencies, as well as a mechanism to ensure compliance by affected state agencies. Moreover, the program is now and has always been subject to continuing reassessment and review by the General Assembly. The General Assembly has, for example, revisited the provisions of R.C. 123.151 on six separate occasions since 1980. Additionally, recent media accounts from throughout the state indicate that the General Assembly is currently preparing to revisit the MBE program in 1999. Thus, Ohio's MBE program is obviously *not* a program that the General Assembly established and then promptly forgot about. Rather, Ohio's MBE program is a matter that has continually occupied the attention of the legislature ever since the program was first established, and it is certainly a matter that will continue to occupy the attention of the General Assembly for some time to come.

{¶ 160} Ninth, and finally, the burdens imposed on non-MBEs by virtue of the set-aside requirements are relatively light. Indeed, with specific reference to appellee, the burden it has been asked to bear as a result of the set-aside provisions of R.C. 125.081(A) has been virtually nonexistent. After all, appellee was

mistakenly allowed to participate in the program and has actually benefited from it for quite some time. In any event, there is no question that where remedial race-based state action is necessary to eliminate the effects of past discrimination, innocent persons may be called upon to bear some of the burden of the remedy. See, *e.g.*, *Wygant*, 476 U.S. at 280-281, 106 S.Ct. at 1850, 90 L.Ed.2d at 273. Suffice it to say that the burdens placed on those not entitled to participate in the benefits of the MBE program are diffused, to a considerable extent, to a wide group of individuals and entities, and that the burdens are minimal indeed. Additionally, those burdens are merely an incidental consequence of the MBE program, not part of the program's objective.

{¶ 161} Accordingly, upon consideration of a host of factors, including the factors outlined immediately above, we find that Ohio's MBE program is sufficiently narrowly tailored to pass constitutional muster. Thus, we are satisfied that Ohio's program need not be invalidated under either prong of the strict scrutiny test formulated by the United States Supreme Court.

VI

{¶ 162} The rationale for requiring strict judicial scrutiny of all governmental racial classifications, we are told, is as follows:

" 'Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed, the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.' " *Adarand*, 515 U.S. at 226, 115 S.Ct.

at 2112, 132 L.Ed.2d at 181, quoting *Croson*, 488 U.S. at 493, 109 S.Ct. at 721, 102 L.Ed.2d at 881-882.

{¶ 163} The classification set forth in R.C. 122.71(E)(1), defining "minority business enterprise" with specific reference to race, was clearly not motivated by illegitimate notions of racial inferiority, illegitimate racial prejudice, or stereotype, or "simple racial politics." Thus, if the purpose of strict scrutiny really is to smoke out any such illegitimate motivations for a governmental racial classification, we are absolutely convinced that, when all the smoke has cleared, no such illegitimate motivations may be attributed to Ohio's General Assembly. There is simply no illegitimate use of race that is plainly visible on the facts of this case.

## VII

{¶ 164} ODAS's hearing examiner found that Ritchey, the sole owner of appellee Ritchey Produce, was Lebanese and that, therefore, Ritchey did not fit within the meaning of the term "Orientals" in R.C. 122.71(E)(1) for purposes of qualifying his business as a "minority business enterprise." ODAS adopted the report and recommendation of the hearing examiner and denied appellee's application for MBE recertification. The court of appeals majority, having decided this case as it did, never reached the issue whether a person of Lebanese ancestry is included within the meaning of term "Orientals" in R.C. 122.71(E)(1). We have already stated our disagreement with the court of appeals' conclusion on the constitutional question. For the reasons that follow, we find that the administrative order denying appellee's application for MBE recertification was supported by reliable, probative, and substantial evidence, and was in accordance with law.

{¶ 165} The term "Orientals" in R.C. 122.71(E)(1) is nowhere defined in the statute. However, Ohio Adm.Code 123:2-15-01(A)(9) defines "Orientals" to mean "all persons having origins in any of the original people of the Far East, including China, Japan and Southeast Asia." ODAS's hearing examiner looked to this definition and a host of other definitions and sources, including the common

definitions of the terms "Orient" and "Oriental" that were considered in *DLZ Corp.*, 102 Ohio App.3d 777, 658 N.E.2d 28. In *DLZ Corp.*, the Court of Appeals for Franklin County considered the question whether the term "Orientals" in R.C. 122.71(E)(1) includes businesses owned and controlled by persons with origins in the country of India or, geographically, the Indian subcontinent, and stated:

"Since the issue presented in this case involves statutory construction, specifically, whether the term 'Orientals' includes people with origins in India, we are guided by R.C. 1.42, which states, in pertinent part:

" 'Words and phrases shall be read in context and construed according to the rules of grammar and common usage.'

"Further, the Supreme Court of Ohio has stated that words left undefined by statute are to be interpreted by using their usual, common and everyday meaning. See *State v. S.R.* (1992), 63 Ohio St.3d 590, 595, 589 N.E.2d 1319, 1323; *State ex rel. Celebrezze v. Allen Cty. Bd. of Commrs*. (1987), 32 Ohio St.3d 24, 27, 512 N.E.2d 332, 334. Therefore, we initially look to common dictionary definitions to assist in determining the meaning of the term 'Orientals.'

"Webster's Ninth New Collegiate Dictionary (1987) 832, defines 'Oriental,' in pertinent part as: 'a member of one of the indigenous peoples of the Orient.' 'Orient' is then defined in Webster's as: ' * * * 2 *cap*: EAST * * *.' *Id*. The term 'oriental' is further defined in Webster's as: ' * * * 1 *often cap*: of, relating to or situated in the Orient * * * 4 *cap*: of, relating to, or constituting the biogeographic region that includes Asia south and southeast of the Himalayas [and] the Malay archipelago west of Wallace's line * * *.' *Id*.

"The Random House Dictionary of the English Language (2 Ed.1987) 1365, defines 'oriental' as: ' * * * 3. (*cap*.) *Zoo-geog*. belonging to a geographical division comprising southern Asia and the Malay Archipelago as far as and including the Philippines, Borneo, and Java. * * * -*n*. 5. (*usually cap*.) a native or

inhabitant of the Orient. * * * ' *Id*. The Orient is then defined as ' * * * 1. the Orient, a. the countries of Asia, esp. East Asia.' *Id*.

"Lastly, Webster's Third New International Dictionary of the English Language (1976) 1591, defines 'oriental' as: '* * * a member of one of the indigenous peoples of the Orient (as a Chinese, Indian, or Japanese).' All of these definitions include within the meaning of the term 'Oriental' or 'the Orient' either people with origins in India or, geographically, the Indian subcontinent. Therefore, a plain reading of the term 'Oriental' as used in R.C. 122.71(E)(1) includes those businesses owned and controlled by persons with origins in the country of India." *DLZ Corp.*, 102 Ohio App.3d at 780-781, 658 N.E.2d at 30-31.

{¶ 166} ODAS's hearing examiner found that none of the definitions referred to in *DLZ Corp.* and none of the other materials considered by the examiner supported the notion that the use of the term "Orientals" in R.C. 122.71(E)(1) includes people of Lebanese descent. The hearing examiner took notice of the fact that Lebanon is situated on the eastern border of the Mediterranean Sea and is not a country of east or south Asia. The Director of Administrative Services adopted the report and recommendation of the hearing examiner and denied the application for recertification of Ritchey Produce.

{¶ 167} To support the contention that a person of Lebanese ancestry is oriental, appellee refers us to the Oxford English Dictionary (2 Ed.1989) for a definition of the term "Orient." That dictionary defines "Orient" as "1. That region of the heavens in which the sun and other heavenly bodies rise, or the corresponding region of the world, or quarter of the compass; the east. Now *poetic* or *rhet*." *Id*. at 929. The term "Orient" is further defined as: "2. That part of the earth's surface situated to the east of some recognized point of reference; eastern countries, or the eastern part of a country; the East; usually, those countries immediately east of the Mediterranean or of Southern Europe, which to the Romans were 'the East', the countries of South-western Asia or of Asia generally * * *; occas., in mod.

American use, Europe or the Eastern Hemisphere.  Now *poetic* or *literary*."  *Id.* Appellee also refers us to Judge G. Gary Tyack's concurring opinion in the court of appeals:  "The concept of 'Orient' and 'oriental' dates at least as far back as ancient Greece.  The area to the east of the Greek city-states was the 'Orient.'  The people who occupied that area were, by definition, 'oriental.' "  In his concurrence, Judge Tyack went on to say:  "Since modern Lebanon is to the east of Greece, modern Lebanon is situated in the area which traditionally was considered the Orient.  Mr. Ritchey's ancestry would, therefore, be from the Orient, qualifying him and his business for consideration as a Minority Business Enterprise."

{¶ 168} To the Romans, to the people of ancient Greece, and to other ancient civilizations and societies, the term "Orient" and "oriental" may have indeed referred to the area of the world that is currently occupied by modern Lebanon.  However, we agree with ODAS's determination that the common, ordinary, and everyday meaning of the term "Orientals," at least as that term is generally used and understood today, simply does not refer to people of Lebanese ancestry or, geographically, to the country of Lebanon.  Accordingly, we find that the term "Orientals," as that term is used in R.C. 122.71(E)(1), does not include people of Lebanese ancestry.  Thus, ODAS's determination denying appellee's application for MBE recertification was supported by the evidence and was in accordance with law.  Therefore, ODAS's final adjudication order should be, and hereby is, approved.

## VIII

{¶ 169} We are aware that Judge James L. Graham of the United States District Court for the Southern District of Ohio, Eastern Division, recently decided, by order dated October 30, 1998, that "Ohio Revised Code Section 123.151 and all rules, regulations and practices promulgated thereunder, which provide for and implement racial or ethnic preference provisions for the awarding of State construction contracts and State construction subcontracts violate the Equal

112

Protection Clause of the Fourteenth Amendment to the United States Constitution." *Associated Gen. Contrs. of Ohio, Inc. v. Drabik* (Oct. 30, 1998), S.D.Ohio No. C2-98-943, unreported, at 1-2, 1998 WL 812241. Additionally, Judge Graham enjoined the defendants in that litigation from "implementing or enforcing the provisions of Ohio Revised Code §123.151 and all rules, regulations and practices promulgated thereunder which provide for racial or ethnic preferences for the awarding of state construction contracts and subcontracts." *Id.* at 2.

{¶ 170} Judge Graham's order dealt only with state construction contracts and subcontracts. In contrast, the case at bar deals with the denial of an application for MBE recertification of a business that was formerly certified to bid on state purchasing contracts for goods and services, *i.e.*, contracts set aside under R.C. 125.081(A)—not R.C. 123.151. Nevertheless, we recognize that our conclusions herein concerning the constitutionality of Ohio's program are at odds with the rationale of Judge Graham's order. In any event, we specifically wish to avoid a direct conflict between the case at bar and the specific requirements of Judge Graham's order in *Associated Gen. Contrs. of Ohio, Inc.* Thus, we limit our holding today to the area of state procurement contracting. We do so in the interests of state and federal judicial comity and because the facts of the case at bar are amenable to a limited holding.

## IX

{¶ 171} The United States Supreme Court has looked at governmental racial classifications with great skepticism and general disfavor, but the court has yet to outlaw the use of benign or remedial race-based measures of the type at issue here. All governmental racial classifications are inherently suspect and thus require the most exacting judicial examination. However, Ohio's MBE program should be upheld unless it is clearly unconstitutional beyond a reasonable doubt. While there may be some legitimate questions concerning Ohio's MBE program, and the question might even be a close one, we are not convinced beyond a reasonable

doubt that Ohio's MBE program is unconstitutional. We have reviewed the program under the strict scrutiny test, and we are satisfied that it passes constitutional muster under the United States Supreme Court's guiding precedents.

{¶ 172} For all of the foregoing reasons, we hold that the provisions of R.C. 125.081 requiring that approximately fifteen percent of the state's purchasing contracts be set aside for competitive bidding by minority business enterprises only and the provisions of R.C. 122.71(E) defining "minority business enterprise" with explicit reference to race are constitutional as applied to deny minority-business-enterprise status to a business owned and controlled by a person of Lebanese ancestry. Further, we hold that Ohio's Minority Business Enterprise Program as it relates to the state's purchasing contracts is sufficiently narrowly tailored to pass constitutional muster. Accordingly, we reverse the judgment of the court of appeals, vacate the judgment of the trial court, and reinstate the order of ODAS denying appellee's application for MBE recertification.

*Judgment reversed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs in judgment.

———————————